## NORTH SUBURBAN SANITARY SEWER DISTRICT AND OTHERS v. WATER POLLUTION CONTROL COMMISSION.

162 N. W. (2d) 249.

October 22, 1968—No. 40,718.

*Douglas M. Head,* Attorney General, and *Chester S. Wilson* and *Richard J. Gunn,* Special Assistant Attorneys General, for appellant.

*Dorsey, Marquart, Windhorst, West & Halladay, Henry Halladay,* and *John M. Mason,* for respondents.

*Keith M. Stidd,* City Attorney, and *Arvid M. Falk,* Assistant City Attorney, for the city of Minneapolis, amicus curiae.

*Luther M. Stalland, Grannis & Grannis,* and *John G. Pidgeon,* for the town of Egan, village of Burnsville, and city of Bloomington, amici curiae.

OTIS, JUSTICE.

These proceedings were initiated by the Water Pollution Control Commission of the State of Minnesota, hereinafter referred to as the Commission, for the purpose of establishing pollution standards for the Mississippi River and its tributaries between the mouth of the Rum River and the St. Croix River, and to adopt regulations relating thereto. Hearings were conducted by the Commission between May 28, 1962, and September 22, 1962, in which the respondent North Suburban Sanitary Sewer District, hereinafter referred to as the District, actively participated. The Commission released its findings and conclusions on March 28, 1963. Thereupon, the District and other respondents appealed to the District Court of Anoka County, challenging the validity of the standards adopted by the Commission. The matter was tried de novo by the court without a jury between June 22, 1965, and July 2, 1965. The testimony adduced

at the Commission hearing was treated as part of the evidence. The court rendered its decision on October 19, 1966, holding invalid all of one standard and a part of another. The Commission appeals from that part of the judgment which sets aside the following standards:

With respect to the Mississippi River and tributaries from the Rum River to the upper lock and dam at St. Anthony Falls (Zone 1),

"No treated sewage effluent shall be discharged into the waters from any source originating after the taking effect hereof, including, without limitation, discharges from watercraft."

With respect to the Mississippi River and tributaries from the upper lock and dam at St. Anthony Falls to the outfall of the Minneapolis-St. Paul Sanitary District sewage treatment plant (Zone 2),

"No major quantities of sewage, industrial waste, or other wastes, treated or untreated, shall be discharged into the waters. No treated sewage, industrial waste, or other wastes containing viable pathogenic organisms shall be discharged into the waters without effective disinfection during the summer months, except under emergency conditions. Effective disinfection of any discharges, including combined flows of sewage and storm water, may be required to protect the aforesaid uses of the waters."

The cities of Minneapolis and Bloomington in Hennepin County and the town of Egan and village of Burnsville in Dakota County have filed briefs amici curiae in this court.

The Water Pollution Control Commission was created by L. 1945, c. 395, § 2, thereafter coded in 1961 as Minn. St. 115.02.[1] Among other powers and duties it was charged with the following (§ 115.03, subd. 1):

"To administer and enforce all laws relating to the pollution of any of the waters of the state;

---

[1] L. 1967, c. 882, coded as Minn. St. c. 116, abolished the Water Pollution Control Commission and created the Pollution Control Agency. It required that the Commission's functions as to pending matters be transferred to the Agency within 6 months of the adoption of the act on May 25, 1967. Consequently, the Pollution Control Agency is now substituted as the appellant in these proceedings.

"To investigate the extent, character, and effect of the pollution of the waters of this state and to gather data and information necessary or desirable in the administration or enforcement of pollution laws, and to make such classification of the waters of the state as it may deem advisable;

"To establish and alter such reasonable pollution standards for any waters of the state in relation to the public use to which they are or may be put as it shall deem necessary for the purposes of sections 115.01 to 115.09;

"To make and alter reasonable orders requiring the discontinuance of the discharge of sewage, industrial waste or other wastes into any waters of the state resulting in pollution in excess of the applicable pollution standard established under this subdivision;

"To require to be submitted and to approve plans for disposal systems or any part thereof and to inspect the construction thereof for compliance with the approved plans thereof;

"To issue, continue in effect or deny permits, under such conditions as it may prescribe for the prevention of pollution, for the discharge of sewage, industrial waste or other wastes, or for the installation or operation of disposal systems or parts thereof;

"To revoke or modify any permit issued under sections 115.01 to 115.09 whenever it is necessary, in the opinion of the commission, to prevent or abate pollution of any waters of the state;

"To prescribe and alter rules and regulations, not inconsistent with law, for the conduct of the commission and other matters within the scope of the powers granted to and imposed upon it by sections 115.01 to 115.09, provided that every rule or regulation affecting any other department or agency of the state or any person other than a member or employee of the commission shall be filed with the secretary of state; and

"To conduct such investigations and hold such hearings as it may deem advisable and necessary for the discharge of its duties under sections 115.01 to 115.09, and to authorize any member, employee, or agent appointed by it to conduct such investigations or hold such hearings."

"Pollution" is defined by § 115.01, subd. 5, as follows: [2]

---

[2] In 1963 the legislature adopted the so-called "Rosenmeier Act" by L.

" 'Pollution' means the contamination of any waters of the state so as to create a nuisance or render such waters unclean, or noxious, or impure so as to be actually or potentially harmful or detrimental or injurious to public health, safety or welfare, to domestic, commercial, industrial or recreational use, or to livestock, wild animals, bird, fish, or other aquatic life."

The respondent District was created by Ex. Sess. L. 1961, c. 90, for the following purposes (§ 1):

"Subdivision 1. That it is the purpose of the legislature of the state of Minnesota to carry out with due speed and in a timely manner a policy of sanitation and water pollution prevention upon sound scientific principles for the protection of public health, safety and general welfare, and to authorize for such purposes a system of sanitary sewage collection, and the creation therefor of a sanitary sewer district as an agency of the state to serve an area in need thereof.

"Subd. 2. The legislature of the state of Minnesota finds that by virtue of location, topography, soil content, governmental structure, and rapid growth, the existing units of government lying northerly of the cities of Minneapolis and St. Paul, located in the counties of Anoka, Hennepin and Ramsey, and consisting of the villages of Brooklyn Park, Blaine, Mounds View, Spring Lake Park, and the cities of Coon Rapids and Fridley, are in urgent need of a system of sewage collection, and are unable without the establishment of a sanitary sewer district therein to efficiently and effectively, and with timely and feasible means meet within their area their urgent and immediate needs for sewage collection, treatment and disposal. That such district, when established, and its benefits can serve also to the use and needs of other municipalities contiguous or adjacent thereto.[3]

"Subd. 3. That to promote the public health, safety and welfare by providing in such area a safe, adequate and efficient system of sewage collection and disposal so that the pollution resulting from the discharge

---

1963, c. 874, coded as Minn. St. 115.41 to 115.53. For purposes of decision in this matter, however, it has no retroactive application.

[3] Brooklyn Park is no longer in the District.

thereof to any watercourse shall be so reduced that such watercourse shall cease to be and shall not become a nuisance or injurious to the public health and welfare, a sanitary sewer system should be constructed within such area. A sanitary sewer district as an agency of the state is accordingly hereby authorized in such area, and the same may be created and established therein; all pursuant to and in accordance with the provisions of this act."

Among other enumerated powers of the District are the following (Ex. Sess. L. 1961, c. 90, § 6, subd. 8):

"The district created or reorganized under this act shall have all of the powers necessary and convenient to act within or without the district so that it may locate and furnish sewage disposal outlets and, in conjunction therewith, provide for the construction, acquisition, betterment, operation, maintenance and administration of any disposal systems, sewage treatment plants, interceptors, mains, laterals, drains, and all other appurtenances incidental thereto as the board shall determine to be necessary and expedient to furnish, provide and make available to the villages of Brooklyn Park, Blaine, Mounds View, Spring Lake Park and the cities of Coon Rapids and Fridley, timely, adequate, efficient and effective systems of sewage collection, treatment and disposal and which said systems of sewage collection, treatment and disposal can and may be enlarged and expanded to furnish, provide and make available the services of the district to lands and areas of municipalities outside the district which are contiguous or adjacent thereto and as may desire or may be found by the state board of health and the state water pollution control commission to be in need of sewage collection, treatment and disposal and are so situated that the needs of the municipality for sewage collection, treatment and disposal in such area can be adequately, efficiently and effectively met by the district."

Pursuant to the duties imposed on it by the legislature, the District has constructed and operated a system of sewage collection and disposal which, by contract, connects with the Minneapolis sewage disposal system and ultimately reaches the Minneapolis-St. Paul Sanitary District's sewage disposal plant at Pig's Eye in St. Paul. In anticipation of the

greatly increased demands on its system during the next 20 to 30 years, arising out of the inevitable growth of the population within its area, the North Suburban Sanitary Sewer District has proceeded with plans to build its own sewage treatment and disposal plant. More immediately, it expects that the Minneapolis system will be overtaxed by the year 1970 or 1971. The plan which it seeks to pursue provides for an outfall of effluent below the Soo Line bridge and will be located 1.1 miles downstream from the main intake, No. 5, of the water supply system of the city of Minneapolis. An emergency intake, No. 4, is located 3,450 feet nearer the proposed effluent outfall. A relatively flat pool of water is created by the St. Anthony Falls dam. It extends approximately 4.6 miles below and 2,000 feet above intake No. 5.

The basic issue to which the Commission addressed itself and which the district court reviewed is whether the evidence supports a finding that the danger of contaminating the Minneapolis water system by locating its effluent outfall 1.1 miles downstream from the main Minneapolis water intake is sufficiently serious to justify adopting a standard which prohibits the discharge of any treated sewage effluent into the Mississippi River from the mouth of the Rum River to the St. Anthony Falls dam. It is the position of the Commission that the possibility of contamination, because of human failures and unusual natural conditions, warrants the adoption of the standard, as qualified by the variance referred to. The District, on the other hand, argues that the standard is not a regulation but a prohibition [4] and that the possibility of combining human errors or natural conditions in a way which could endanger public health is so remote the standard is unreasonable and invalid.

The Commission found the following conditions to exist in the District:

"* * * Pollution from overloaded and overflowing septic tanks and other local domestic sewage disposal facilities causes serious local nuisance conditions and public health hazards, and some of said pollution is occasionally carried into said Zone 1 of the river and run-off of surface water at times of heavy rainfall. There is urgent need for an adequate sewage

---

[4] Claesgens v. Animal Rescue League, Inc. 173 Minn. 61, 216 N. W. 535.

and waste disposal system for the communities in said district in order to eliminate the conditions aforesaid."

The Commission found it was feasible for the District either to construct mains leading into the Pig's Eye plant or to discharge its effluent into the Mississippi above the St. Anthony Falls dam. However, it also found that even highly treated sewage effluent contains some disease-producing organisms which, if mixed with the intake system, would require a higher degree of purification of the water treated for public consumption. It further noted that through negligence or by accident, explosion, or other disaster the effluent could be discharged into the river without sufficient treatment and would thereby increase the disease hazard. The Commission, in addition, alluded to the possibility of effluent backing up to the intake system under unusual climatic conditions. It concluded with the following statement:

"In order to reduce such lowering of water quality and disease hazards as far as possible, it is a principle and practice of good public health engineering not to permit any sewage, industrial wastes, or other wastes, or effluents from treatment thereof, to be discharged into any waters serving as the source of public water supply so that any such discharge could reach any public water supply intake if any other means for proper disposal of such sewage, wastes, or effluents is available."

Thereupon, the standard described as Section 3(b) governing the Mississippi between the mouth of the Rum River and the St. Anthony Falls dam, subject to a variance found in Section 3(i), was adopted as follows:

Section 3(b). "No treated sewage effluent shall be discharged into the waters from any source originating after the taking effect hereof, including, without limitation, discharges from watercraft."

Section 3(i). "In any case where, upon application of the responsible person or persons, the Commission finds after a hearing thereon that by reason of exceptional circumstances the strict enforcement of a provision of these standards would cause undue hardship and would be unreasonable, that disposal of the sewage, industrial waste, or other wastes involved is necessary for public health, safety, and welfare, and that no means for

such disposal in strict conformity with the standards is reasonably available, the Commission, in its discretion, may permit a variance therefrom upon such conditions as it may prescribe for prevention, control, or abatement of pollution and in harmony with the general purpose and intent of the standards."

The pertinent part of the standard governing the Mississippi from the St. Anthony Falls dam to the Pig's Eye plant, was as follows (Section 3[a]):

"No major quantities of sewage, industrial waste, or other wastes, treated or untreated, shall be discharged into the waters. No treated sewage, industrial waste, or other wastes containing viable pathogenic organisms shall be discharged into the waters without effective disinfection during the summer months, except under emergency conditions. Effective disinfection of any discharges, including combined flows of sewage and storm water, may be required to protect the aforesaid uses of the waters."

This standard was also qualified by a variance similar to that quoted above.

On appeal to the district court, an exhaustive hearing was conducted which, together with the evidence taken at the Commission hearing, resulted in a printed record of nearly 2,000 pages. The trial court held:

"It is feasible, as respondent found, and it is lawful, reasonable, and warranted by the evidence, to dispose of treated sewage, consistent with reasonable pollution standards, from a sewage treatment plant with an outfall discharging effluent therefrom into the Mississippi River at or near the Soo Line bridge in said Zone I.

"The evidence before respondent and before said Court does not warrant the action of respondent contained in the prohibitions of subsection (b) of Section 3 'Standards' for said Zone I * * * and in the first sentence of subsection (a) of Section 3 'Standards' for said Zone II * * *."

The court concluded that the prohibitions contained in those standards were not reasonable or lawful, that they were arbitrary and unreasonable,

exceeded the statutory powers of respondent, and were not rendered valid by the variances referred to. The standards were accordingly set aside and the case was remanded for appropriate proceedings to grant a permit for the discharge of treated sewage effluent and the installation and operation of a disposal system at the Soo Line bridge location.

In an accompanying memorandum the court stressed the fact that it was unreasonable to prohibit the discharge of all effluent regardless of its harmless effect or the efficiency of its treatment. The court observed that expert testimony indicated no other pollution control or health agency had imposed a prohibition of this kind elsewhere in the United States. Under the prohibition it would be futile for the District to apply for a permit, and the variance, the court stated, could be denied at the whim of the Commission. It concluded by saying that the statutes, if interpreted to authorize the prohibition, would be an unconstitutional delegation of legislative power.

■ A matter dealt with extensively in the Commission's brief, but not argued orally except by passing reference in rebuttal, is whether the adoption of standards raises a justiciable issue which is reviewable in district court. The Commission argues with some force that, even if they have the effect of law under Minn. St. 15.0413 as a rule or regulation, the standards cannot be attacked on appeal to the district court until they are actually applied in a manner detrimental to the District. The statutory authority for the appeal to the district court, § 115.05, provides in part as follows:

"Subd. 3. An appeal may be taken from any final order, rule, regulation, or other final decision of the commission by any person who is or may be adversely affected thereby, or by the attorney general in behalf of the state, to the district court of the county in which the premises affected by such final order, rule, regulation, or other final decision are situated in the manner herein provided. * * *

* * * * *

"Subd. 7. The appeal shall be heard and determined by the court upon the issues raised by the notice of appeal and return according to the rules relating to the trial of civil actions, so far as applicable. The court of its

own motion or on application of any party may, in its discretion, take additional evidence on any issue of fact or may try any or all such issues de novo, but no jury trial shall be had. If the court shall determine that the action of the commission appealed from is lawful and reasonable, and is warranted by the evidence in case an issue of fact is involved, the action shall be affirmed. Otherwise the court may vacate or suspend the action appealed from in whole or in part, as the case may require, and thereupon the matter shall be remanded to the commission for further action in conformity with the decision of the court."

Whether or not the standards here under attack are, strictly speaking, orders, rules, regulations, or a final decision of the Commission, we are of the opinion that the contention that the District is not "adversely affected" until it has applied for and been denied a permit as required by § 115.03, subd. 1, is unrealistic. It is significant that under § 115.05, subd. 10, the District was placed in a position where it could not collaterally attack the standards if they were construed to be an "order, rule, regulation, or other decision of the commission." The standards on their face would prohibit the construction of a treatment plant such as that which is planned by the District. That was the very issue which it presented to the Commission in an adversary manner. It might have been better practice for the District to make formal application for a permit and appeal to the district court from an order denying the permit. The same may be said of the variance provisions on which the Commission strongly relies. The District chose to attack the standards head on without seeking a variance, arguing that the standards constituted an outright prohibition rather than a regulation.[5]

We have difficulty accepting the contention of the Commission that on this record the appeal to the district court was either unauthorized or premature because, so the Commission asserts, there is no showing that

---

[5] The New Jersey Superior Court has held that the power to grant a variance "is neither a crutch to support the sagging frame of an unconstitutional zoning ordinance nor a panacea for the cure of its fatal illness." Glen Rock Realty Co. v. Board of Adjustment, 80 N. J. Super. 79, 88, 192 A. (2d) 865, 870.

it was disposed to refuse a variance. This argument, we believe, is without substance. We are not persuaded that the Commission would have doggedly supported its findings and standards through months of litigation in the district and supreme courts if, as it now suggests, it was from the inception agreeable to issuing a variance permitting the District to build a plant with its effluent outfall below the Soo Line bridge. Technical niceties aside, it is clear from the action of the Commission in adopting the standards, and from its vigorous defense of them that the District would have been placed in the same posture in which it now finds itself had it pursued the remedies the Commission contends were proper and available. Consequently, we hold that the district court had jurisdiction under the statute, the District was an aggrieved party, and the issues are justiciable.

■ The statute under which the appeal was taken from the Commission to the district court embodies the case law governing the scope of judicial review of administrative orders, limiting the court's determination to whether or not the decision of the Commission was lawful and reasonable and warranted by the evidence. State v. Duluth, M. & I. R. Ry. Co. 246 Minn. 383, 394, 75 N. W. (2d) 398, 406, appeal dismissed, 352 U. S. 804, 77 S. Ct. 46, 1 L. ed. (2d) 38; Minneapolis St. Ry. Co. v. City of Minneapolis, 251 Minn. 43, 61, 86 N. W. (2d) 657, 670; Johnson v. Village of Cohasset, 263 Minn. 425, 431, 116 N. W. (2d) 692, 697; City of Minneapolis v. Minneapolis Transit Co. 270 Minn. 133, 141, 133 N. W. (2d) 364, 370.

We have concluded that on this record the trial court was justified in holding that the standards are unreasonable in so far as they prohibit the discharge of all treated sewage effluent into the Mississippi River between the mouth of the Rum River and the St. Anthony Falls dam, and prohibit the discharge of major quantities of treated sewage into the Mississippi River between St. Anthony Falls dam and the Pig's Eye treatment plant. We base our conclusions on two factors: First, the prohibition is absolute, subject only to the variance provision, without reference to the purity of the effluent; and, secondly and decisively, we concur in the finding that the prohibition is unreasonable to the extent it is based on

the possibility of effluent discharged at the Soo Line outfall reaching the main Minneapolis water intake 1.1 miles up the river. Our decision is limited, however, to a holding that on this record and as applied to the District's proposal now under consideration the trial court was justified in finding the standards invalid. We expressly decline to hold that the standards are otherwise void or of no force and effect. To the extent that the decision of the trial court holds that the adoption of the standards is not lawful for any purpose, the conclusions of the court are reversed. It is only the application of the standards to this particular fact situation under the conditions set forth in this record which is improper. It may well be that the standards are lawful and reasonable in prohibiting the discharge of effluent under different circumstances or in different areas of the Mississippi River from the Rum River to Pig's Eye. For example, the record would undoubtedly support a prohibition against discharging effluent *above* the Minneapolis water intake in Zone 1.

Without attempting an exhaustive summary of the voluminous expert testimony presented both to the Commission and the trial court, it is enough to say that there was competent evidence to support a finding that even intensively treated effluent may contain disease-bearing organisms. There was also testimony that properly treated effluent did not pose a threat to public health, and that it was, indeed, safe to drink. Nevertheless, it was the prerogative of the Commission to accept the view that it is not feasible to eliminate all possibility of dangerous contamination.

Notwithstanding the fact that sewage effluent is not 100-percent pure, the experts agreed that proper and routine treatment in a municipal water system by the use of chlorine and other processes renders the water completely safe for public consumption. While the Commission concedes this to be the fact, it argues that human failure, natural disasters, and acts of violence may cause a breakdown both in the treatment of effluent in the sewage system and in the treatment of the water taken in from the river for human consumption. It asserts in its brief:

"No one is claiming in the instant case that the effluent from the North Suburban District's proposed sewage treatment plant or any other similar plant, if properly operated, would be a nuisance per se or would

cause anything like nuisance conditions under ordinary flow stages or higher in the Mississippi River. However, it was clearly established by undisputed testimony at the hearing and at the trial, as hereinafter referred to, that treated sewage effluent, as that term must be reasonably construed as hereinbefore pointed out, is, under certain possible conditions, capable of causing serious harm to the public health and other public interests and hence must be considered as a dangerous or potentially dangerous instrumentality per se from the standpoint of water pollution, and therefore subject to the Water Pollution Control Act and the authority of the Commission thereunder."

The Commission has vigorously argued that public health procedures must be geared to the possibility of infection and not simply to its probability, and that it is their duty to exercise the utmost vigilance to foresee and prevent such a possibility by "playing safe," and taking no unnecessary chances.[6]

Four disastrous possibilities to which the Commission points are (1) a simultaneous bombing of the sewage treatment and water-purification plants in time of war; (2) an act of vandalism or sabotage which would disable both plants; (3) negligence or human failure on the part of engineers in the treatment and purification plants; and (4) natural conditions which would permit the effluent to back up 1.1 miles to the main Minneapolis water intake. Both in its brief and in oral argument the Commission concedes that these contingencies are remote. However, it earnestly asserts that there is sufficient danger to justify its position.

The argument presented by the District in support of the findings that the standards are unreasonable is persuasive. Acts of vandalism, sabotage, negligence, and destruction in time of war are contingencies so remote and so unlikely to occur that we believe factors which counterbalance them prevail. It should be borne in mind that not only must the effluent find its way upstream, but in order to pose a substantial threat to public health there must be a simultaneous breakdown in sewage treatment and in the

---

[6] State ex rel. Freeman v. Zimmerman, 86 Minn. 353, 357, 90 N. W. 783, 784, 58 L. R. A. 78; Schulte v. Fitch, 162 Minn. 184, 189, 202 N. W. 719, 721; Id. 166 Minn. 498, 207 N. W. 639.

purification of the water. These are two wholly separate, unrelated processes, either one of which could fail safe if the other continued to function.

As far as the natural conditions necessary for the effluent to reach the water intake, the testimony was conclusive that the following circumstances would have to occur simultaneously, and that the likelihood of their happening was once in 26 years, even if preventive measures were not taken: (1) There would have to be a drought more severe than any now on record, bringing the flow of the river to its lowest point in history; (2) it would have to be at a time when the river was not frozen so as to prevent a backward flow; (3) the wind would have to be from the south or southeast; (4) the velocity of the wind would have to be at least 50 miles an hour for a continuous period of 6 or 6½ hours; (5) the flashboards on the St. Anthony Falls dam would have to remain up and the locks closed; (6) the District would have to discharge highly contaminated raw sewage into the river at its outfall; and (7) the sewage reaching the Minneapolis intake would have to go through the purification system without adequate treatment.

It was undisputed that even under these unlikely conditions, no effluent could reach the Minneapolis water intake if a low dam were built between the sewage outfall and the water intake. All experts agreed this would effectively prevent any backing up of effluent under the drought conditions described. Such a dam, it was estimated, could be constructed for $100,000.

On the other side of the ledger, and militating against the position of the Commission, is the fact that there is an increasing urgency to dispose of sewage and waste emanating from the North Suburban Sanitary Sewer District.[7] It is true that under the Rosenmeier Act the District can compel renegotiation of its contract with the Minneapolis-St. Paul Sanitary District. The Commission also points out that ultimately storm sewers may be available for sewage purposes. However, two compelling considerations weigh heavily against denying the District access to the river at its proposed outfall. First, the refusal to issue a permit would not divert

---

[7] See, Borough of Westville v. Whitney Home Builders, 40 N. J. Super. 62, 83, 122 A. (2d) 233, 243.

pollution to any destination other than the Mississippi River itself. The Commission's proposed solution would require a 30-mile conduit to the Pig's Eye plant which is already badly overloaded. Thus, the water below Pig's Eye would be massively polluted rather than dispersing the effluent over a broader area and permitting greater dilution. More significantly there was evidence that the immediate cost would be some $10,000,000 in excess of that for a plant which had its outfall at the Soo Line bridge.

We recognize that there is an emergency intake 3,450 feet closer to the proposed outfall than the main Minneapolis intake. This is a factor we have not overlooked. However, the record does not indicate it is of decisive importance. Our conclusions are based on a review of the entire record which compels us to hold that the reasons assigned by the Commission for the absolute prohibition do not afford a reasonable basis for adopting these standards. We are persuaded that in this particular situation the variances do not rehabilitate the standards because clearly no variance is forthcoming.

We therefore hold that as applied to the proposal made by the District to the Commission in 1962, the standards are unreasonable.[8] As the Commission correctly points out, the only function of the court is to rule on the validity of the Commission's decision and the court does not promulgate standards of its own.

Except as they apply to the District's proposal in this matter, we hold that the standards are reasonable and valid. Consequently, without a permit effluence may not be discharged into the Mississippi River in the areas to which the standards apply. The result of our decision is that unless there are presently circumstances which are not disclosed in this record, or substantial changes in conditions which have occurred since the time of the initial hearing the District is entitled to a permit for a sewage treatment plant with its outfall below the Soo Line bridge. We do not, however, foreclose the Commission, whose functions are now assumed by the Pollution Control Agency, from conducting whatever supplementary hearing it deems necessary to arrive at a final decision based on current conditions if there have been significant changes since the adop-

---

[8] Cf. Richardson v. Beattie, 98 N. H. 71, 77, 95 A. (2d) 122, 126.

tion of the standards in 1962. The matter is therefore remanded to the district court for amended findings and conclusions consistent with the decision we here reach. No costs or disbursements are allowed to any party.

Affirmed in part and reversed in part.

