## RESERVE MINING COMPANY v. MINNESOTA POLLUTION CONTROL AGENCY.

200 N. W. 2d 142.

August 18, 1972—No. 43117.

*Warren Spannaus,* Attorney General, and *John M. Mason,* Chief Deputy Attorney General, for appellant.

*Sullivan, Hanft, Hastings, Fride & O'Brien, Edward T. Fride, C. Byron Holje,* and *James L. Hetland, Jr.,* for respondent.

*Koll, Fahlgren & Hartfeldt* and *Will Hartfeldt,* for Sierra Club, North Star Chapter, National Wildlife Federation, and Minnesota Conservation Federation, amici curiae.

*Johnson & Thomas* and *Wayne G. Johnson,* for Villages of Silver Bay and Beaver Bay, amici curiae.

*Reavill, Neimeyer, Johnson, Fredin & Killen* and *Joseph B. Johnson,* for Northwestern Minnesota Development Association, amicus curiae.

*Applequist, Nolan, Donovan, Larson, Barnes & Mathias* and *John M. Donovan,* for Duluth Area Chamber of Commerce, amicus curiae.

TODD, JUSTICE.

The Minnesota Pollution Control Agency (PCA) appeals from a judgment entered in the District Court of Lake County and from an order of that court denying PCA's motion for a new trial. PCA challenges those parts of the judgment which determined that the appeal of Reserve Mining Company from a PCA regulation had been timely filed; that regulation WPC 15(c)(6) was arbitrary and unreasonable as applied to Reserve; and that it was within the power of the trial court to remand the matter to PCA with instructions to negotiate a variance and to retain

jurisdiction to insure that the negotiation process was completed. The matter is thus before us on narrow procedural grounds. We have not been called on to discuss the merits of the case, and we accordingly refrain from doing so. The judgment is affirmed in part and reversed in part.

Reserve Mining Company is a Minnesota taconite mining and beneficiating company operating at the eastern end of the Mesabi Range. Taconite ore is mined at Babbitt, Minnesota, and is then transported by rail to Reserve's taconite processing plant at Silver Bay, Minnesota, on the north shore of Lake Superior. Prior to beginning commercial operations in 1956, Reserve constructed the villages of Babbitt and Silver Bay and has invested over $350,000,000 in its total processing complex. The plant currently produces 10,000,000 tons of taconite pellets annually, which represents about 12 percent of the total production of taconite pellets in the United States.

In 1947, prior to beginning construction, Reserve successfully sought permits for the establishment of its facilities from the Water Pollution Control Commission[1] and the Department of Conservation.[2] The permits allowed Reserve to withdraw water from Lake Superior for use during its processing operations, and, upon completion of processing, to return the water, now carrying waste tailings, into the lake. The issuance of the permits was premised on the operation of the phenomenon known as the "heavy density current." As a result of this phenomenon, the discharge waters carrying the waste tailings, which are heavier than the surrounding waters, will generate a velocity greater than the surrounding currents and carry the waste tailings to an area of the floor of Lake Superior offshore from the plant facilities. In this area, known as the "great trough," the lake depth is approximately 900 feet. The permits are, by their own terms, revocable, should any material pollution result. The trial

[1] This was a predecessor agency of PCA.
[2] Now known as the Department of Natural Resources.

court expressly declined to make findings as to possible violation of the original permits. Accordingly, that issue is not before us on this appeal.

In 1956, and again in 1960, the original permits were amended to increase gallonage of discharge permitted; presently, Reserve discharges the water at a rate of 400,000 gallons per minute, with the result that 67,000 tons of industrial waste are deposited into Lake Superior every day. Approximately one-half of the suspended solids is deposited on a delta offshore from Reserve's plant facilities; almost all of the balance is eventually confined to the great trough area of Lake Superior. The evidence indicates that the present density of tailings in the waters discharged into Lake Superior off the edge of the delta is 14,000 milligrams per liter.

In 1967, regulation WPC 15, which was designed to protect and enhance the quality of interstate waters, was adopted. The original regulation did not contain clause (a)(4), the anti-degradation clause, or clause (c)(6), the effluent-standard or secondary-treatment clause. The original WPC 15 was submitted to Federal authorities for their consideration under the provisions of the Federal Water Pollution Control Act as amended in 1965 (33 USCA, § 1160[c]). Under the terms of the Federal act, the state regulations could be submitted to Federal authorities, and, if approved by them, would thereafter become the Federal water quality standards applicable to interstate waters, such as Lake Superior. Pursuant to these discussions with the Department of the Interior, material alterations were made in the regulation.

On April 8, 1969, amendments to WPC 15, including clauses (a)(4) and (c)(6), were adopted by PCA, and on June 30, 1969, the amended regulation was filed with the secretary of state and the commissioner of administration of the State of Minnesota. The regulation was again forwarded to the Department of the Interior and discussion continued. On November 26, 1969, the Secretary of the Interior approved WPC 15, as amended, as a

304

Federal regulation. On December 24, 1969, Reserve filed its notice of appeal to the district court, challenging the general validity of WPC 15, as well as the specific application of clauses (a)(4)[3] and (c)(6) to Reserve.

■■■ PCA first contends that Reserve's appeal to the district court was not timely made. In support of this contention it cites Minn. St. 115.05, subd. 3, which states in part as follows:

"An appeal may be taken from any final order, rule, regulation, or other final decision of the agency by any person who is or may be adversely affected thereby, or by the attorney general in behalf of the state, to the district court of the county in which the premises affected by such final order, rule, regulation, or other final decision are situated in the manner herein provided. Within 30 days after receipt of a copy of the order, rule, regulation, or decision, or after service of notice thereof by registered mail, but not in any case more than six months after the making and filing of the order, rule, regulation or decision, the appellant or his attorney shall serve a notice of appeal on the agency through its secretary; provided, that during such 30 day period the court may, for good cause shown, extend such time for not exceeding an additional 60 days, but not beyond the expiration of such six months' period."

It is obvious that Reserve's appeal was made within 6 months of June 30, 1969, which the state contends is the effective date of the regulation. Reserve contends that the effective date of the regulation is November 26, 1969, the date it was approved by the Secretary of the Interior, and that its appeal is within 30 days of this date.

The state relies on Minn. St. 15.0413, subd. 1, which provides in part as follows:

---

[3] The trial court found that clause (a) (4) applies only to those beginning or expanding a discharge program after June 30, 1969. Since PCA has agreed that the section would not affect Reserve, it is not before us on this appeal.

"Every rule or regulation filed in the office of the secretary of state as provided in section 15.0412 shall have the force and effect of law upon its further filing in the office of the commissioner of administration."

It is uncontradicted that WPC 15, including the amendments which are the subject of this controversy, was duly filed. We hold that under our statutes, WPC 15, as amended, became an effective regulation on June 30, 1969, and the time for appeal commenced from that date.

However, in determining whether Reserve's appeal was timely, we must further consider the provisions of § 115.05, subd. 3, quoted above. The 30-day appeal period prescribed therein commences only after an affected party, such as Reserve, has received a copy of the order or after service of notice thereof by registered mail.

PCA admits that through inadvertence Reserve did not receive a mailed notice of a copy of amended WPC 15 as filed on June 30, 1969. There is evidence that copies were exchanged between the director of PCA and representatives of Reserve on two separate occasions prior to November 26, 1969, but PCA admits that on neither of these occasions were copies delivered with an intent to conform to the requirements of the statute. Therefore, we hold that, since the appeal by Reserve was made within 6 months from the date of the adoption of the rule, and since there was no service of a copy on Reserve by mail or delivery with intent to conform to the requirements of the statute, Reserve's appeal was timely.

As its second ground for appeal, PCA questions the jurisdiction of the trial court to make certain of the findings of fact and conclusions of law which led to the judgment which is the subject of this appeal. Reserve correctly points out that under § 115.05, subd. 10, if an appeal had not been taken, the validity of the regulation could not have been challenged in any other

way.[4] Reserve's challenge to the general validity of this regulation was thus entirely proper; this challenge, however, was decided adversely to it, and that holding has not been questioned on this appeal. Consequently, WPC 15 is valid in its general application.

If the trial court had stopped at that point in the proceedings, there would be no further issue to be discussed. However, the trial court proceeded to hear extensive additional testimony from a great number of expert witnesses, evaluated numerous exhibits, made a detailed and scholarly study of the complex issues presented to it, and entered a judgment which on its face is very practical. However, a close scrutiny of the applicable statutes indicates that the trial court in some respects has exceeded its jurisdiction.

PCA vigorously asserts that the trial court had no power to proceed beyond the determination that WPC 15, as amended, was a valid regulation. In determining this question, we must consider § 115.05, subd. 7, of the Water Pollution Control Act and § 15.0416 of the Administrative Procedure Act, which provide as follows:

Section 115.05, subd. 7. "The appeal shall be heard and determined by the court upon the issues raised by the notice of appeal and return according to the rules relating to the trial of civil actions, so far as applicable. The court of its own motion or on application of any party may, in its discretion, take additional evidence on any issue of fact or may try any or all such issues de novo, but no jury trial shall be had. If the court shall determine that the action of the agency appealed from is lawful and

---

[4] Minn. St. 115.05, subd. 10, provides: "If no appeal be taken from an order, rule, regulation, or other decision of the agency as herein provided, or if the action of the agency be affirmed on appeal the action of the agency in the matter shall be deemed conclusive, and the validity and reasonableness thereof shall not be questioned in any other action or proceeding, but this shall not preclude the authority of the agency to modify or rescind its action."

reasonable, and is warranted by the evidence in case an issue of fact is involved, the action shall be affirmed. Otherwise the court may vacate or suspend the action appealed from in whole or in part, as the case may require, and thereupon the matter shall be remanded to the agency for further action in conformity with the decision of the court."

Section 15.0416. "The validity of any rule may be determined upon the petition for a declaratory judgment thereon, addressed to the district court where the principal office of the aency is located, when it appears that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair the legal rights or privileges of the petitioner. The agency shall be made a party to the proceeding. The declaratory judgment may be rendered whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question."

Reading these statutes together, it appears that the legislature has unquestionably conferred upon the trial court the right to take additional evidence and, derivatively, to make findings with regard to that evidence. At this point, however, the statutes diverge, each providing for a different type of eventual disposition. In resolving this conflict, the specific provisions of § 115.05, subd. 7, take precedence over the general provisions of § 15.0416.[5] Consequently, after the trial court had heard the additional evidence and made the appropriate findings, it should, under the provisions of the Water Pollution Control Act, have

---

[5] Minn. St. 645.26, subd. 1, provides: "When a general provision in a law is in conflict with a special provision in the same or another law, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions be irreconcilable, the special provision shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted at a later session and it shall be the manifest intention of the legislature that such general provision shall prevail."

remanded the matter to the PCA for further action in conformity with the decision of the trial court.

WPC 15(c)(6) provides as follows:

"It is herein established that the Agency will require secondary treatment or the equivalent as a minimum for all municipal sewage and biodegradable, industrial or other wastes to meet the adopted water quality standards and a comparable high degree of treatment or its equivalent also will be required of all non-biodegradable industrial or other wastes unless the discharger can demonstrate to the Agency that a lesser degree of treatment or control will provide for water quality enhancement commensurate with present and proposed future water uses and a variance clause. Secondary treatment facilities are defined as works which will provide effective sedimentation, biochemical oxidation, and disinfection, or the equivalent, including effluents conforming to the following:

| "Substance or Characteristic | Limiting Concentration or Range |
|---|---|
| "5-Day biochemical oxygen demand | 25 milligrams per liter |
| Total coliform group organisms | 1,000 MPN/100 ml |
| Total suspended solids | 30 milligrams per liter |
| Oil | Essentially free of visible oil |
| Turbidity | 25 |
| pH range | 6.5 - 8.5" |

The trial court could and did find that WPC 15(c)(6) was arbitrary and unreasonable in its application to Reserve. The court found that this provision as applied to Reserve would in effect be self-defeating since a density of 30 milligrams per liter would prevent operation of the heavy density principle and would thus increase rather than decrease pollution. It "would in effect have closed down Reserve Mining Company's operation," since

it would obviously result in material pollution of Lake Superior and Reserve would be in violation of its original permit.

At this point, however, the trial court was required by statute to cease any further participation in the determination of this matter. Section 115.05, subd. 7, quoted above, clearly indicates that the trial court should have remanded the matter to the agency for further action. The regulation itself contemplates that variances will be required and variance procedures are established under WPC 15(a)(5).[6] The court had no statutory power to compel negotiations between PCA and Reserve regarding the issuance of a variance.

Reserve contends that under our decision in North Suburban Sewer Dist. v. Water Pollution Comm. 281 Minn. 524, 162 N. W. 2d 249, 32 A. L. R. 3d 199 (1968), it is entitled to a determination of the issue of the specific application of the regulation without applying for a variance from the regulation as provided for under WPC 15(a)(5). In that case, North Suburban Sanitary Sewer District had proposed constructing a sewage treatment plant on the shores of the Mississippi River and discharging its effluent into the river at a point one mile below the water intake in the city of Minneapolis. The WPCC adopted a regulation prohibiting the discharge of any sewage effluent in the area of the

---

[6] WPC 15(a)(5) provides: "Variance from Standards. In any case where, upon application of the responsible person or persons the Agency finds that by reason of exceptional circumstances the strict enforcement of any provision of these standards would cause undue hardship; that disposal of the sewage, industrial waste or other waste is necessary for the public health, safety or welfare; and that strict conformity with the standards would be unreasonable, impractical or not feasible under the circumstances; the Agency in its discretion may permit a variance therefrom upon such conditions as it may prescribe for prevention, control or abatement of pollution in harmony with the general purposes of these classifications and standards and in the intent of the applicable state and national laws. The Federal Water Pollution Control Administration will be advised of any permits which may be issued under this clause together with information as to the need therefor."

proposed sewage plant. The sewer district, without applying for a permit or variance, appealed directly to the district court under the provisions of § 115.05. We there held (281 Minn. 534, 162 N. W. 2d 256, 32 A. L. R. 3d 210) :

"* * * It might have been better practice for the District to make formal application for a permit and appeal to the district court from an order denying the permit. The same may be said of the variance provisions on which the Commission strongly relies. The District chose to attack the standards head on without seeking a variance, arguing that the standards constituted an outright prohibition rather than a regulation.

"We have difficulty accepting the contention of the Commission that on this record the appeal to the district court was either unauthorized or premature because, so the Commission asserts, there is no showing that it was disposed to refuse a variance. This argument, we believe, is without substance. We are not persuaded that the Commission would have doggedly supported its findings and standards through months of litigation in the district and supreme courts if, as it now suggests, it was from the inception agreeable to issuing a variance permitting the District to build a plant with its effluent outfall below the Soo Line bridge. Technical niceties aside, it is clear from the action of the Commission in adopting the standards, and from its vigorous defense of them that the District would have been placed in the same posture in which it now finds itself had it pursued the remedies the Commission contends were proper and available. Consequently, we hold that the district court had jurisdiction under the statute, the District was an aggrieved party, and the issues are justiciable."

The North Suburban case is peculiar to its facts. The regulation involved there prohibited *any* discharge in the area involved. Further, as a practical matter, the zone to which the regulation applied included a limited area of the Mississippi River, and the probability of the construction of more than one sewage disposal

plant in that area was highly unlikely. Consequently, the court was able in that case to brush aside technical niceties and deal directly with the problem in the interests of justice. However, the fact situation in this case is entirely different. Minnesota has several hundred miles of shoreline on Lake Superior. The regulation adopted applies to all persons interested in locating on or near any interstate water in Minnesota, including Lake Superior, and is not specifically aimed at Reserve Mining Company.

In light of the disposition which we have made, we do not deem it necessary to discuss numerous additional issues which have been raised by both parties. Further, it should be noted that the appeal before this court raises only procedural questions, and no appeal has been taken as to any issue raised in the original appeal, answer, and counterclaim filed with the district court.

We affirm the decision of the trial court that the appeal of Reserve was timely made and that WPC 15, as amended and filed on June 30, 1969, is a valid regulation.

We reverse that part of the court's judgment directing that the parties should negotiate a variance. This distorts the regulatory process. The statutory provisions clearly contemplate that the proper place to determine the standards and regulations and variances therefrom is before the agency. We held in North Suburban (281 Minn. 539, 162 N. W. 2d 259, 32 A. L. R. 3d 214):

"* * * As the Commission correctly points out, the only function of the court is to rule on the validity of the Commission's decision and the court does not promulgate standards of its own."

We therefore remand the matter to the district court with instructions to remand the matter to the PCA for proceedings under the regulations of WPC 15(a)(5) for the granting of a variance, such proceeding is to be in conformity with the decision of the trial court as required in § 115.05, subd. 7, quoted above. Neither party shall be allowed costs or disbursements.

Affirmed in part and reversed in part.