RESERVE MINING COMPANY, Republic Steel Corporation, Armco Steel Corporation, City of Silver Bay, City of Beaver Bay, Town of Beaver Bay, Lake County, St. Louis County, Northeastern Minnesota Development Association (NEMDA), Duluth Area Chamber of Commerce, City of Babbitt, Range League of Municipalities, Lax Lake Property Owners Association, and the Silver Bay Chamber of Commerce, Respondents,

v.

MINNESOTA POLLUTION CONTROL AGENCY, Appellant,

and

Save Lake Superior Association, Intervenor, Appellant.

Nos. 48352, 48393.

Supreme Court of Minnesota.

April 14, 1978.

Warren Spannaus, Atty. Gen., for MPCA and amicus curiae for Minnesota Dept. of Natural Resources, seeking reversal.

Richard Allyn, Sol. Gen., Eldon G. Kaul, Asst. Atty. Gen., Alan Mitchell, John-Mark Stensvaag, Sp. Asst. Atty. Gen., Byron E. Starns, Chief Deputy Atty. Gen., for MPCA.

Dayton, Herman & Graham and Charles K. Dayton, Minneapolis, for Save Superior Assoc.

Hanft, Fride, O'Brien & Harries and Edward T. Fride, Duluth, Lindquist & Vennum and Maclay R. Hyde, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan and O. C. Adamson II, Minneapolis, for Reserve.

Rider, Bennett, Egan, Johnson & Arundel, William T. Egan, Minneapolis, for Republic Steel Corp.

Faegre & Benson and G. Alan Cunningham, Minneapolis, for Armco Steel Corp.

Johnson & Thomas and Wayne G. Johnson, Silver Bay, for City of Silver Bay, et al.

Helgesen, Peterson, Engberg & Spector and John G. Engberg, Minneapolis, for United Steelworkers of America, AFL–CIO.

C. Paul Faraci, Deputy Atty. Gen., James M. Schoessler, Sp. Asst. Atty. Gen., for amicus curiae Minnesota Dept. of Natural Resources, seeking reversal.

OTIS, Justice.

This litigation reviews the propriety of permits issued by Minnesota Pollution Control Agency (PCA) to Reserve Mining Company (Reserve) for the construction and operation of an on-land site for the disposal of taconite tailings at Reserve's Silver Bay processing plant.

The problem of abating air and water pollution, generated by Reserve's mining operations at its Peter Mitchell Mine near Babbitt, has engaged the time and attention of the Federal and state courts for nearly 6 years. What began in 1972 as a proceeding to prevent further pollution of Lake Superior eventually broadened into protracted efforts by the state to prevent a potentially serious health hazard caused by the emission of amphibole fibers in the ambient air at Silver Bay. The Federal court ordered the termination of Reserve's disposal of its tailings into Lake Superior by April 15, 1980. In response to that mandate, Reserve attempted to secure from PCA and the Department of Natural Resources (DNR) permits for an on-land disposal site at Mile Post 7 in the vicinity of its present processing plant. The agencies' refusal to

grant that permit resulted in further litigation in the state courts which we ultimately resolved in favor of the site sought by Reserve. The chronology of those proceedings is set forth in detail in *Reserve Mining Co. v. Environmental Protection Agency*, 514 F.2d 492 (8 Cir. 1975), and *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808 (Minn.1977).

Following our formal opinion entered May 27, 1977, PCA and DNR began negotiating terms of the permits that would govern the construction and operation by Reserve of the processing plant and tailing basin at Silver Bay. Unwilling to accept the permits proposed by the agencies on July 15, 1977, Reserve sought and obtained from a three-judge panel of the District Court of Lake County, an order to show cause why the agencies should not grant permits as directed by this court. The PCA board thereafter, on July 26, issued a permit which was subsequently modified by the PCA staff at a so-called "master negotiating session" on July 29, 1977.[1]

On August 11, the trial court conducted a hearing on the order to show cause as twice amended. The decision of the trial court was rendered on October 31, 1977, and is the subject of these appeals by PCA and by Save Lake Superior Association.[2] The trial court held that PCA acted arbitrarily and capriciously by including conditions in its permit which the court found were not fair and reasonable and for which the court substituted conditions advocated by Reserve.

We hold that the conditions contained in the permit adopted by the PCA board and the amendments approved by its staff comply with the directives of the Federal court as construed and amplified by this court. Accordingly, the PCA permit is reinstated with full force and effect and the order of the trial court dated October 31, 1977, is reversed.

*The Disputed Permit Conditions*

The PCA permit here for consideration is a 36-page document, 32 pages of which are not in dispute. The most significant conditions substituted by the trial court were five in number, summarized as follows:

1. The PCA permit, in dealing with air quality, provided as follows:

"[T]he ambient air shall contain no more fibers than that level ordinarily found in the ambient air of a control city such as St. Paul;"

The trial court added the following:

" * * * provided that a fiber level exceeding the level in any control city shall not be non-compliance with this permit unless such level is in excess of a medically significant level;"

2. The PCA permit included the following:

"[T]he fibers in the ambient air shall be maintained below a level which is injurious to human health or welfare in violation of Minnesota Statute Section 116.-06(3);"

This condition was entirely omitted by the trial court. However, since compliance with the statute was mandated by the Federal court, *Reserve Mining Co. v. Environmental Protection Agency*, 8 Cir., 514 F.2d 492, 539, note 85, Reserve concedes that the omission was probably inadvertent and has no objection to its being reinstated. Minn.St. 116.06, subd. 3, provides as follows:

" 'Air pollution' means the presence in the outdoor atmosphere of any air contaminant or combination thereof in such quantity, of such nature and duration, and under such conditions as would be injurious to human health or welfare, to animal or plant life, or to property, or to interfere unreasonably with the enjoyment of life or property."

3. The PCA permit defined fibers as follows:

---

1. Although the PCA board has not formally adopted these amendments we infer from the briefs and arguments of counsel that they have the approval of the board.

2. The terms of the DNR permit to which Reserve has agreed adopt by reference conditions of the PCA permit. DNR appears in these proceedings as amicus curiae in support of PCA's position.

" 'Fibers', for the purpose of this permit, are defined as chrysotile and amphibole mineral particles with 3 to 1 or greater aspect ratios."

The trial court included in that definition "silicate mineral particles" and added:

" 'Silicate minerals' include but are not limited to serpentines, Minnesotaite, stilpnomelane, greenalite, pyroxenes and talcs."

4. In dealing with water quality conditions, PCA applied Minn.Reg. WPC 14(a)(8) as the parties agreed to do.[3] The trial court added these conditions:

" * * * Any such fiber level in waters emanating from Petitioners' operations shall not be non-compliance with this Permit unless such level is in excess of a medically significant level."

In addition, the trial court struck from the PCA permit all of pages 9 through 12 and substituted in their place the equivalent pages contained in so-called Draft No. 4 prepared and advocated by Reserve. The significant change thereby adopted consisted of eliminating "fibers" as a parameter in establishing water quality criteria for surface waters.

5. In its requirement for "quality assurance and non-routine compliance monitoring" PCA stated:

"The Permittees shall make available to the Director portions of all fiber water samples. Unless otherwise determined by the Director, approximately 25% of all fiber samples shall be analyzed by the Agency. The Permittees shall split ten percent of all other water quality field samples as requested by the Director and make them available to the Director for analyses for the purpose of assuring quality data.

"The Permittees shall make available to the Director portions of all fiber air samples. Approximately one-sixth of all these samples shall be analyzed by the Agency."

The trial court directed the parties to consider their conflicting versions of this section and to "negotiate monitoring and quality assurance permit conditions."

### Scope of Review

This appeal again raises the recurring issue of the scope of the trial court's authority in reviewing decisions of administrative agencies. Here, the court found that PCA acted arbitrarily and capriciously and proceeded to substitute conditions advocated by Reserve for those adopted by PCA. Although Minn.St. 15.0425 authorizes a court to "modify" a decision of an administrative agency if it is arbitrary or capricious, that drastic remedy is viewed with disfavor and should be reserved for only extraordinary situations. In our previous decision we endorsed the principle that in scrutinizing administrative decisions there is a "need for exercising judicial restraint and for restricting judicial functions to a narrow area of responsibility lest [the court] substitute its judgment for that of the agency." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825. Here, we find no evidence to support the court's conclusion that the agency acted arbitrarily and capriciously. Had the agency done so, however, it was the duty of the trial court to remand the matter to the agency to correct its own errors and fashion amended permits within the broad principles prescribed by the reviewing court. In our opinion, the wholesale substitution of conditions advocated by Reserve was not justified by the language of the Administrative Procedure Act as we have heretofore construed it. *St. Paul Area Chamber of Commerce v. Minn. Public Service Comm.*, Minn., 251 N.W.2d 350, 358 (1977) and *Minnesota Distillers, Inc. v. Novak*, Minn., 265 N.W.2d 420 (1978).

### The Continuing Jurisdiction of the Federal Court

In considering the propriety of these permits, two considerations of fundamental importance govern us. First, we made it clear in our prior decision and now reiterate that the parties to this litigation are governed by the Federal court's decision in *Reserve*

3. The terms of that regulation are set forth in this opinion, *infra*.

*Mining Co. v. Environmental Protection Agency,* 8 Cir., 514 F.2d 492, and that Reserve will be held strictly to the conditions already imposed or hereafter changed or modified by that court and by state and Federal pollution laws. As we have previously indicated, the Federal court initially assumed jurisdiction because Lake Superior constituted an interstate and international body of water. As the litigation progressed and the dimensions of the air pollution issue expanded, the Federal court invoked the doctrine of pendent jurisdiction. It recognized, however, that the Federal courts would not otherwise have independent jurisdiction over the air pollution issue. 514 F.2d 522, note 55.

Second, the permit conditions which were appended to our original order of April 7, 1977, and the subsequent opinion of May 27, 1977, were reached by mutual agreement between PCA, DNR, Reserve, Armco Steel Corporation and Republic Steel Corporation. None of those conditions was drafted or prepared by this court and none of them raised an issue on which this court was obliged to pass when our prior decision was rendered. They were adopted by the court on the representation by all parties that those conditions reflected the composite views and agreement of the state agencies and the various mining companies. There was no suggestion by counsel that any of the conditions we attached to our decision was controversial or that their interpretation and implementation would be the subject of further litigation.

### Air Quality

■ Reserve has proposed and the trial court adopted as a standard for air quality a fiber level which PCA must approve "unless such level is in excess of a medically significant level." What the trial court neglected to add is the Federal court's definition of what constitutes a medically significant level. The Federal court has repeatedly stressed that Reserve's discharges into the air and water give rise to a potential threat to public health and that although no harm has yet been shown to have occurred and the danger to health is not imminent, preventive and precautionary steps are required. That court held that Reserve's air and water discharges pose a danger which justified judicial intervention.

With respect to air pollution, the Federal court said the hazard could not be measured in terms of predictability and the assessment must be made without direct proof. In defining a medically significant level of fiber counts in the ambient air at Silver Bay the Federal court held: " * * * Controls may be deemed adequate which will reduce the fiber count to the level ordinarily found in the ambient air of a control city such as St. Paul."

*Reserve Mining Co. v. Environmental Protection Agency,* 514 F.2d 492, 538.[4] At the time that opinion was written, St. Paul was apparently the only control city with which to compare Silver Bay because there had been a fiber count in St. Paul and it was a city removed from the exposure of fiber emissions generated by taconite processing. Reserve now attacks the validity of that comparison as a standard on the ground that there was testimony before the PCA board that St. Paul might have an amphibole fiber count of zero.[5] If this is true, it

4. See, also, *Reserve Mining Co. v. Environmental Protection Agency,* 514 F.2d 492, 511, 521, note 54 (D.Minn.1975), where St. Paul is referred to as "the" control city.

5. It is clear that the trial court seized on this testimony to reject the Federal court's standard. At the conclusion of the August 11, 1977, hearing this colloquy occurred between counsel for PCA and the court:

"[COUNSEL]: * * * What we say is that the control city standard has been found by the federal court to be based on a reasonable medical theory, but we go on to recognize that that particular reasonable medical theory is under continuing scrutiny in the federal courts.

"[THE COURT]: Except you know it can't be met because there are no amphibole fibers in St. Paul.

"[COUNSEL]: There are chrysotile fibers.

"[THE COURT]: So the decision doesn't mean anything, it's dictum to the Decision. If there are no applicable fibers in St. Paul.

"[COUNSEL]: I do not know ---

"[THE COURT]: Just a minute, I think we know that in the lawsuit that we had they didn't find any. Of course, you did take it out

is argued, the fiber count in Silver Bay could not be reduced to that level as the Federal court required.

There are a number of fallacies in this argument. First, as all parties agree, St. Paul is not necessarily the only control city to be used for comparison with Silver Bay. At such time as reasonably reliable fiber counting techniques are applied in some other city, remote from exposure to taconite dust emissions, a new basis for comparison may be established. Furthermore, the testimony before the PCA board regarding the fiber count in St. Paul was simply the opinion of one expert and was based in part on the difficulty of securing agreement on counting techniques. Testimony in the Federal court resulted in a consensus that there *was* a measurable fiber level in St. Paul but the disparity in numbers approached a geometrical progression. We alluded to these facts in great detail in *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 833, where we recognized that neither the level of asbestiform fibers in the ambient air emitted by the Reserve plant, nor whether it was a medically significant level, could be determined with scientific or medical precision. Nevertheless we adopted as the Federal court required, the standard of fiber levels in a control city such as St. Paul. Neither PCA, the mining companies, nor the state courts, are at liberty to modify or set aside that standard. The Federal court has not only retained jurisdiction but has invited experts in the field to submit further data as counting techniques improve. Accordingly, if any modification of the Federal court standard is to be undertaken, it must be sought in that jurisdiction. In our prior decision we noted that without adequate mitigation, the use of an on-land disposal site will generate carcinogenic amphibole fibers dangerous to health. Nothing has been presented to the Federal court or to this court which requires us to retreat from that position, and the control city standard remains viable.

of the lake outside of St. Paul. But your people have admitted at the hearings there are no amphibole fibers, that was just stated to us."

## Definition of Fibers

◼ The definition of fibers contained in the PCA permit was limited to chrysolite and amphibole mineral particles. All of the testimony before the Federal court and the state agencies related to those minerals. They were the only substances with carcinogenic properties considered for abatement. Although they are silicate minerals, there was no evidence that all other silicates had similarly dangerous propensities. Nevertheless the trial court adopted Reserve's proposal that all silicates be included in fiber counting. This, of course, would grossly distort the process of comparing fiber counts in a control city with fiber counts at Silver Bay since it would include a comparison of innocuous fibers with those which were carcinogenic.

Reserve justifies this procedure on the ground that we have mandated a single standard for the entire taconite industry, and other industries may be generating silicate emissions which are potentially dangerous. What this argument overlooks is the fact that the Federal court has judicially determined that Reserve's operations occur in a unique area in the Mesabi range, 1 mile wide and 15 miles long. The taconite ore, which is there mined, contains the mineral cummingtonite grunerite which the Federal court said could not be meaningfully distinguished from amosite asbestos.[6]

We hold that there was no justification for including all silicate mineral particles in fiber counting. For practical purposes that requirement would make it impossible to obtain reliable data with respect to demonstrably dangerous fibers at Silver Bay compared to a control city, wherever it is located.

## Water Quality

By agreement of the parties, Minn.Reg. WPC 14(a)(8) was accepted as a condition for maintaining an on-land disposal basin. That regulation includes the following language:

6. 514 F.2d 492, 501 note 9.

"Waters which are of quality better than the established standards shall be maintained at high quality unless a determination is made by the Agency that a change is justifiable as a result of necessary economic or social development and will not preclude appropriate beneficial present and future uses of the waters. Any project or development which would constitute a source of pollution to waters of the state shall be required to provide the best practicable control technology currently available not later than July 1, 1977 and the best available technology economically achievable not later than July 1, 1983, and any other applicable treatment standards as defined by and in accordance with the requirements of the Federal Water Pollution Control Act, 33 U.S.C. 1251 et. seq., as amended, in order to maintain high water quality and keep water pollution at a minimum  *  *  *."

■ As we have indicated, the trial court added a condition that a fiber level in water would not be in noncompliance unless it exceeded a medically significant level. What we said about that test, as it applies to air emissions, governs the disposition of this amendment as well. There is no evidence of what level of water pollution is medically significant. PCA is therefore at liberty to apply a nondegradation standard until and unless a medically significant level is in the future determined with scientific precision, as we pointed out in our prior opinion.

■ Concern has been expressed by Reserve over the strict application of a nondegradation standard during construction. One of the requirements mandated by the trial court was a provision which would relax this standard and permit some turbidity during the construction period. As we read the PCA permit, it contemplates the establishment of a nondegradation standard at a later time and allows for unavoidable turbidity until the basin is completed. However, we find no justification for the court's elimination of fibers as a parameter in controlling water quality. We, therefore, conclude that the addition of language

to Minn.Reg. WPC 14(a)(8) and the substitution of pages 9 through 12 of Reserve Draft No. 4 dealing with water quality were unwarranted. Accordingly, that portion of the PCA permit as modified by its staff is, in our opinion, reasonable and proper and is reinstated.

*Nonroutine Compliance Monitoring*

■ The trial court rejected the provisions of the PCA permit governing monitoring and ordered the parties to negotiate that function. We held in *Reserve Mining Co. v. Minnesota PCA*, 294 Minn. 300, 309, 200 N.W.2d 142, 147 (1972) that the court had no authority to compel PCA and Reserve to negotiate compliance with Minn. Reg. WPC 15(a)(5) under the applicable statute Minn.St.1974, § 115.05, subd. 7. No authority for such an order under the statutes which here apply has been called to our attention.

Permit conditions to which the parties have agreed are set forth in our prior opinion, *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 813:

" 'i) The permittees shall be required to monitor the Mile Post 7 basin structures and the air and water in and adjacent to the tailings disposal area for the purpose of enabling any reaction to any potentially hazardous condition. The permittees shall establish an air and water monitoring program to be approved by the Minnesota Pollution Control Agency and shall operate this monitoring program with the capability of providing information necessary for rapid response in applying mitigating measures and procedures. Such air and water monitoring shall include, but is not limited to, the identification and counting of fibers by such methods as x-ray diffraction, electron microscopy or any other methods as the PCA may specify.

" 'j) Reasonable costs for monitoring and analysis beyond the routine compliance monitoring conducted by the PCA or consultants directed by the PCA shall be borne by the permittees.' "

Pursuant to that agreement, the PCA permit included the following paragraphs:

"The permittees shall make available to the Director portions of all fiber water samples. Unless otherwise determined by the Director, approximately 25% of all fiber samples shall be analyzed by the Agency. The Permittees shall split ten percent of all other water quality field samples as requested by the Director and make them available to the Director for analyses for the purpose of assuring quality data.

"The Permittees shall make available to the Director portions of all fiber air samples. Approximately one-sixth of all these samples shall be analyzed by the Agency."

Reserve objected to providing PCA with 25 percent of all water fiber samples and one-sixth of all air fiber samples for analysis by the agency at Reserve's expense. PCA contends that the monitoring advocated by Reserve would amount to two air fiber samples per site per year and one water fiber sample per site every 3 years. PCA's monitoring requirements are: One air fiber sample for each of six sites every 18 days; one surface water fiber sample at each site per season; and one ground water fiber sample from each site twice a year. It was the opinion of the PCA experts that the sampling which PCA directed was essential to meet rapid response requirements in applying mitigating measures.

Reserve complains that the PCA monitoring procedures are needlessly expensive, unnecessary, and usurp Reserve's prerogative of determining an appropriate monitoring program. Our examination of the record finds little support for these contentions. During the preliminary stages of construction and operation of the tailings basin, it is essential that the agency determine with some accuracy the existing fiber levels in the water in a state of nature. Without such a determination the degree of pollution attributable to the operation of the basin cannot, of course, be established. PCA must therefore be allowed some latitude in deciding the nature and extent of the fiber monitoring in the early stages of Reserve's operations. It is not to be presumed that such discretion will be abused.

As the agency refines its techniques and collects the data which it deems necessary to discharge its duties, the degree of monitoring will undoubtedly diminish.

Although it is our duty to resolve disputes which arise between the competing interests of commerce and the general public, we think it appropriate to observe that neither the interests of clients nor the administration of justice is served by protracted litigation of this kind. Courts are ill-equipped to deal with technical engineering problems. It is now the responsibility of Reserve, an industry important to the people of Minnesota, and of PCA, an agency charged with protecting the environment, to make mutual concessions and exercise restraint to reach an accord and end this controversy.

The order of the district court dated October 31, 1977, is reversed and the PCA's permit as modified by the so-called master negotiating session, dated August 2, 1977, is herewith reinstated.

Reversed.

SHERAN, C. J., took no part in the consideration or decision of this case.