UNITED STATES of America,
Plaintiff,

The State of Michigan et al.,
Plaintiffs-Intervenors,

State of Minnesota and Minnesota Pollution Control Agency, Plaintiffs,

v.

RESERVE MINING COMPANY et al., Defendants,

Northeastern Minnesota Development Association et al., Defendants-Intervenors.

No. 5–72–Civil–19.

United States District Court,
D. Minnesota,
Fifth Division.

Feb. 21, 1976.

Edward T. Fride, Duluth, Minn., and Maclay R. Hyde, Minneapolis, Minn., for defendant Reserve Mining Co.

William T. Egan, Minneapolis, Minn., for defendant Republic Steel Co.

John B. Gordon and G. Allen Cunningham, Minneapolis, Minn., for defendant Armco Steel Co.

Wayne G. Johnson, Silver Bay, Minn., for defendants Village of Beaver Bay, Silver Bay Chamber of Commerce, Village of Silver Bay, Town of Beaver Bay, Lax Lake Property Owners Ass'n.

John E. Varnum, Washington, D. C., for plaintiff United States.

Michael H. Ferring, St. Paul, Minn., for United States Army Corps of Engineers.

Byron E. Starns, Philip Olfelt, C. Paul Faraci and James M. Schoessler, St. Paul, Minn., for plaintiff State of Minnesota.

William P. Dinan, Robert E. Asleson, Daniel C. Berglund, Duluth, Minn., for plaintiff City of Duluth.

Howard J. Vogel, Minneapolis, Minn., for plaintiffs Minnesota Environmental Law Institute, Inc., Northern Environmental Council, Save Lake Superior Ass'n, Michigan Environmental Student Confederation, Inc., and Environmental Defense Fund, Inc.

## ORDER

DEVITT, Chief Judge.

Plaintiff United States seeks reimbursement and advance payment of an estimated six million dollars from defendants Reserve Mining Company, Armco Steel Company, and Republic Steel Company for expenses incurred and to be incurred in carrying out the Court ordered temporary water filtration program in Duluth, Minnesota, and other North Shore communities.

By motion filed January 28, 1976, United States moves defendants be required (a) immediately to pay two million dollars to defray anticipated interim filtration expense to July 31, 1976, (b) to pay $3,728,085 by August 1, 1976 to defray anticipated expense for the period August 1, 1976 to April 30, 1977 and (c) to pay immediately $288,800 as reimbursement for interim filtration expense already expended. Defendants deny liability.

Briefs have been lodged and exchanged. Argument was heard February 18, 1976.

The Court is satisfied from all of the files and records, findings and conclusions, decisions of the District Court and Court of Appeals, the briefs and oral arguments, that Reserve, Armco and Republic (hereinafter Reserve) are liable for the interim costs of filtering and furnishing safe drinking water to the relevant communities on the North Shore of Lake Superior.

The Army Corps of Engineers was ordered by the District Court, and on two occasions by the Court of Appeals for the Eighth Circuit, to finance and manage the temporary water filtration program. It was never contemplated that the Corps should bear the ultimate responsibility for the program. The necessity for water filtration came to light in the midst of this substantial litigation in which plaintiffs have claimed and established that defendants discharge contains millions of amphibole asbestos fibers which pollute the drinking water of several North Shore communities endangering the health and welfare of thousands. Based on these findings, the District Court (Judge Lord presiding) issued an injunction calling for an immediate abatement of the discharge. *United States v. Reserve Mining Co.,* 380 F. Supp. 11, 16, 17, 20, 21 (D.Minn.1974). On appeal the injunction was affirmed with modification allowing for abatement to take place pursuant to a time table set out by the Court of Appeals for the Eighth Circuit. *Reserve Mining Co. v. Environmental Protection Agency,* 514 F.2d 492, 499–500 (8th Cir. 1975). The Court of Appeals agreed that the discharge into the water created a potential health threat endangering the health and welfare of North Shore citizens, but that the threat was not sufficiently imminent to justify an immediate abatement. *Id.* at 500, 528. Nonetheless, it was held that the discharge did pose a danger to the public health sufficient to justify "judicial action of a preventive nature." *Id.* at 535.

In addition to the injunction, the preventive measures included a continuation of the filtration program undertaken by the U. S. Army Corps of Engineers pursuant to order of the District Court. *Id.* at 540. Some months later, the Court of Appeals restated its view "that water filtration would have to continue for many years," *Reserve Mining Co. v. Lord,* 529 F.2d 181 at 182 (8th Cir. 1976). In ordering that clean water be supplied to the affected communities, the Court stated:

> We direct the Corps of Engineers to adequately filter drinking water and furnish safe drinking water for the

relevant communities on the North Shore of Minnesota. . . . We direct continuance of filtration, supervision of filtering units and supply of bottled water until construction of permanent facilities has been completed. (at p. 183)

As to defraying costs for such expenditures, the Court of Appeals stated:

Reimbursement for any expenditures by the United States or the local communities in carrying out the filtration program rests within the jurisdiction of the district court. Upon proper motion and notice by the Corps or governmental units involved, and hearing, the district court shall determine what amounts Reserve must pay for the interim costs of abatement. at p. 184

Defendant makes several arguments in contesting liability.

1) There is no legal basis authorizing the United States action to seek reimbursement for the interim water filtration expenses.

2) Reserve's discharge does not create a health hazard sufficient to justify removal of their wastes.

3) Factors other than Reserve's discharge contribute to the suspended solids in the public drinking water.

4) Water filtration is a governmental function and to require defendants to pay for water filtration would result in an unconstitutional taking of property for a public purpose.

5) Basic fairness requires that Reserve not be made responsible for these costs.

(1)

Reserve argues that there is no legal authority permitting the United States to seek reimbursement for costs disbursed in the interim filtration program. The argument is without merit. The remedy sought by the plaintiffs is that defendants be held responsible for removing the potential disease producing fibers they have spread into the public drinking water of North Shore communities. The Court of Appeals has already commented that "a court is not powerless to act in these circumstances," *Reserve Mining Co. v. Environmental Protection Agency,* 514 F.2d at 536. Furthermore, from the above quoted language, the Court of Appeals has determined that the United States has the right to move for reimbursement and have this Court decide the merits of the issue. *Reserve Mining Co. v. Lord,* at p. 184.

This determination is certainly consistent with the federal court's equitable powers to implement its judgments. It has been established that Reserve's discharge violates the Federal Water Pollution Control Act (hereinafter FWPCA), 33 U.S.C. § 1151, *et seq.* (1970).[1]

It is settled that the courts may fashion appropriate relief, including mandatory relief, when a violation of federal law has been established. *See Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); *United States v. Republic Steel Co.,* 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960); *United States v. Rohm and Haas,* 500 F.2d 167 (5th Cir. 1974) *cert. denied,* 420 U.S. 962, 95 S.Ct. 1352, 43 L.Ed.2d 439, 43 L.W. 3472; *United States v. Armco Steel Co.,* 333 F.Supp. 1073 (S.D.Tex.1971).

The *Wyandotte* case is analogous. It involved the consolidation of two actions in which barges were sunk in navigable waters in violation of § 15 of the Rivers and Harbors Act, 33 U.S.C. § 409. In *United States v. Cargill, Inc.,* the United States sought injunctive relief requiring that the defendant be responsible for removing the barges. In *United States v. Wyandotte Transportation Co.,* the United States itself had removed the sunken barge and sought reimbursement for the costs of removal. The United States removed the barge in *Wyandotte* because

---

1. All references to the FWPCA are to the statute as it was in effect prior the 1972 amendments. *See Reserve Mining Co. v. Environmental Protection Agency,* 8 Cir., 514 F.2d 492 at 501, n. 7.

it contained chlorine. "It was feared that if any chlorine escaped, it would be in the form of lethal chlorine gas, which might cause a large number of casualties." 389 U.S. at 194, 195, 88 S.Ct. at 382, 19 L.Ed.2d at 411.[2]

Although the Rivers and Harbors Act did not specifically provide for injunctive relief or for reimbursement expenses, the Court held at 204, 88 S.Ct. at 387, 19 L.Ed.2d at 416:

> The Government may, in our view, seek an order that a negligent party is responsible for rectifying the wrong done to maritime commerce by a § 15 violation. Denial of such a remedy to the United States would permit the result, extraordinary in our jurisprudence of a wrongdoer shifting responsibility for the consequences of his negligence onto his victim. It might in some cases permit the negligent party to benefit from commission of a criminal act. We do not believe that Congress intended to withhold from the Government a remedy that ensures the full effectiveness of the Act. We think we correctly divine the congressional intent in inferring the availability of that remedy from the prohibition of § 15.

As for the reimbursement expenses, the Court went on to say at 204, 88 S.Ct. at 387, 19 L.Ed.2d at 417:

> It is but a small step from declaratory relief to a civil action from the Government's expenses incurred in removing a negligently sunk vessel. *See United States v. Perma Paving Co.,* 332 F.2d 754 (2nd Cir. 1964). Having properly chosen to remove such a vessel, the United States should not lose

the right to place responsibility for removal upon those who negligently sank the vessel. . . .

As in the *Wyandotte* case, the United States is seeking reimbursement for alleviating a potential health risk caused by a defendant in violation of federal law.

Certainly the courts' powers are no less under the FWPCA. Congress vested the courts with full powers to fashion equitable relief. 33 U.S.C. § 1160(h) provides:

> The court, giving due consideration to the practicability and to the physical and economic feasibility of securing abatement of any pollution proved, shall have jurisdiction to enter such judgment and orders enforcing such judgment, as the public interest and the equities of the case may require.[3]

In addition to the FWPCA, Reserve's discharge violates the Refuse Act, Sec. 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 407 (1970), and is subject to relief pursuant to its provisions. *Reserve Mining Co. v. Environmental Protection Agency,* 514 F.2d at 532. It is clear that a court may fashion an appropriate mandatory remedy for violations of the Refuse Act, Sec. 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 407 (1970). *See United States v. Republic Steel Co., supra, United States v. Rohm and Haas, supra; United States v. Armco Steel Co., supra.*

Based on the findings in this case, the United States has the right to seek reim-

---

**2.** As in the instant case, this "fear" was characterized by the circuit court as a "potential" hazard. *United States v. Cargill, Inc.,* 367 F.2d 971, 973 (5th Cir. 1966).

**3.** Reserve cites a statement in the Senate Committee Report on Sec. 311 of the 1972 amendments to the FWPCA, 1972 U.S.Code Cong. and Admin.News at p. 3732 in an effort to limit the scope of this provision. This state-

ment does not limit the clear language in the statute. The statement relied upon by Reserve was given in the context of 33 U.S.C. § 1162, the thrust of which deals with spills and other isolated discharges of toxic substances. 33 U.S.C. § 1160(h) is set up to cover repeated and systematic violations of federal water quality standards after extensive administrative proceedings.

bursement for the costs of interim water filtration.[4]

## (2)

Defendants' argument that injury from the contaminated water is only speculative hence not supportive of an assessment of the cost of clean water against them is fatuous. Both the District and Appellate Courts have found Reserve's discharge to be a health hazard. It is not required by law, or by common sense, that illness and death are conditions precedent to taking preventive measures against such a health hazard. In affirming the trial court's injunction, the Court of Appeals has concluded that the discharge constitutes a sufficient risk to require abatement and the removal of existing fibers from the public drinking water. Defendants did not appeal from these determinations.

## (3)

Defendants maintain that they are not solely responsible for the contaminants in Lake Superior and hence should not be solely responsible for the cost of furnishing clean water. The simple answer to this is that there may be other impurities in Lake Superior water which are also incidentally removed by filtration, but the necessity for interim purification was occasioned solely by Reserve's discharge of amphibole asbestos fibers in its taconite tailings causing the health hazard to exist.

Defendants call our attention to the historical recommendations of the Minnesota Department of Health that Duluth build a water purification plant, and urge that the need for filtration and purification of the water was present long before Reserve started operations. Re-

serve specifically refers to other amphibole fibers and nonamphibole fibers (including diatomaceous and mineral fibers, and chrysotile asbestos fibers) which enter the lake from natural sources, and are removed by the filtration process.

The argument well may be pertinent and meritorious in whole or in part when plaintiffs seek reimbursement for construction of the permanent water filtration plant. We are now dealing only with reimbursement for interim costs of filtration. This Court is in the posture of assessing liability for temporary water filtration expenses incurred as a result of previous court orders. As a consequence only those materials that were a proximate or direct cause of the filtration orders are relevant. There are no findings that the amphibole hornblende or "diatoms" are dangerous to health and hence they could not have played any part in the decision to require interim filtration. There is a finding that chrysotile asbestos is equally as dangerous as amosite. *United States v. Reserve Mining Co.*, 380 F.Supp. at 41. However, there are no findings as to chrysotile being present in the water supply or contributing to the potential risk. The presence or absence of chrysotile had no part in the decision to require interim water filtration. The court ordered filtration program was in direct response to the findings of amphibole asbestos fibers in the drinking water of North Shore communities.[5] It has been established that Reserve was responsible for substantially all of these fibers.

After a nine month trial, the trial judge made extensive findings as to the identity of the particles in Reserve's discharge and the transportation of these fibers into public water supplies. Based on what appears to be overwhelming evi-

4. In that the relief sought can be afforded under the Refuse Act, and FWPCA, this Court does not need to reach the question of whether or not the discharge also constitutes a nuisance in violation of the federal common law. *See Reserve Mining v. Environmental Protection Agency*, 514 F.2d at 532.

5. The only asbestos materials pertinent to this proceeding are the amphibole amosite and the

nonamphibole chrysotile, p. 63 Transcript of Proceedings, February 18, 1976. The findings reflect only the presence of amphibole fibers. *United States v. Reserve Mining Co.*, 380 F.Supp. at 47. *Reserve Mining Co. v. Environmental Protection Agency*, 514 F.2d at 516, 517, 520.

dence the District Court concluded that Reserve contributed all of the cummingtinite-grunerite (which would include amosite) that could be identified in Lake Superior, 380 F.Supp. at 36. In so doing, Reserve's claims that cummingtinite-grunerite comes into Lake Superior in detectable quantities from natural sources were rejected.

These findings were not reversed on appeal and obviously formed the basis for the Circuit Court's conclusion that Reserve's discharge into the water posed a potential health threat. *See Reserve Mining v. Environmental Protection Agency,* 514 F.2d at 507, n. 20, in which the Court of Appeals expresses general agreement with the findings of "historical facts."

In addition, the trial judge made findings that the defendants discharge roughly 67,000 tons of wastes daily. Forty-four percent of this material is amphibole of which 50–70% is in the cummingtinite-grunerite range, 380 F.Supp. at 33, 34. Reserve's discharge contributes five to six times more suspended solids into Lake Superior than the combined total of all natural sources. Of the natural sources under five microns, there are only 640–1,300 tons entering, whereas Reserve contributes 3,500–5,800 tons finer than five microns. *Id.* at 34. Furthermore, the currents carry Reserve's discharge down into the western end of Lake Superior to Duluth and Superior, Wisconsin. *Id.* at 16. As samples are taken further from the plant the number of amphibole fibers decreases steadily. *Id.* at 35. *See also Reserve Mining Co. v. Environmental Protection Agency,* 514 F.2d at 516, n. 48. Finally water samples from the Stewart, Baptism, Beaver, St. Louis, Knife, Manitou and Lester Rivers all revealed an absence of amphibole material of any type. 380 F.Supp. at 35.

Based on these findings, the Court can come to no other conclusion but that Reserve is responsible for essentially all of the amphibole asbestos fibers found in the public drinking water of the relevant communities. In that the interim filtra-

tion was ordered to remove these amphibole asbestos particles, Reserve should bear the sole liability.

At the oral arguments on this motion Reserve suggested that this decision should not be based on the findings in the record but that additional evidence should be taken and new findings made. They cite two reasons:

1) The issue of the identity and source of particles in the water supply has not been litigated;

2) Certain new evidence would provide a basis for determining what portion of the contamination is caused by Reserve.

The record does not support the first claim. Several plaintiffs included in their complaints a claim for clean up costs associated with the discharge, a nine month trial took place, and the question of financial responsibility for water filtration was taken under advisement by the trial judge. *United States v. Reserve Mining Co.,* 380 F.Supp. at 17. On August 23, 1974, in response to questions from the Court, counsel for defendants agreed that the issues of the identity and source of the suspended solids in the drinking water had been fully litigated. T–19,908–19,909, 19,919–19,920.

When this Court questioned counsel as to what evidence they were precluded from introducing at trial, counsel replied that the trial judge refused to admit evidence of asbestos contamination of water supplies in other communities and evidence relating to the biological, as opposed to human health, effects of the discharge. In addition, Reserve would now like to offer new evidence going to certain congressional action in this area, and additional analysis of water samples. Reserve cannot say what these new samples will show in terms of Reserve's contribution. None of this evidence bears directly on the reasons for ordering water filtration. This Court does not wish to preclude anybody and intends to insure that all parties are fairly and completely heard. Nonetheless, there must be an end to the litigation process. There was a nine month trial, the case was submitted and extensive findings

have been made. The legal issue as to financial liability is ripe for decision. The decision can and should be made based on the findings in this case.

The Court has given much consideration to the possibility of apportioning damages, although neither party has expressly sought this remedy. After a review of the authorities and the record in this case, it is clear that there is no reasonable basis for apportionment. *See e. g., Mathews v. Mills*, 288 Minn. 16, 178 N.W.2d 841 (1970); *Johnson v. City of Fairmont*, 188 Minn. 451, 247 N.W. 572 (1933); *Anderson v. Minneapolis, St. P. & S. S. M. Ry. Co.*, 146 Minn. 430, 179 N.W. 45 (1920); W. Prosser, Law of Torts, § 52, (4th ed. 1971), Restatement (Second) of Torts § 433 A and B (1965).

### (4)

Defendants argue they should not be required to pay interim water costs because furnishing clean water in an emergency is a governmental responsibility and to require the defendants to pay would be an unconstitutional taking of private property for a public purpose. There is no merit in this claim. The logic of it is basically faulty because to subscribe to it would exempt the wrongdoer from accountability for his fault. It is hard to see how defendants' property is unconstitutionally taken from them when the Court specifically directed the furnishing of clean water facilities and supplies following a finding that a health hazard existed proximately caused by Reserve's pollution.

The pertinent statute, 33 U.S.C. § 701n, as amended in 1974, authorizes the Chief of Engineers "in the exercise of his discretion is further authorized to provide emergency supplies of clean drinking water" but "on such terms as he determines to be advisable." Here the Chief of Engineers has determined that defendants caused the pollution and should reimburse the United States for the clean water. The motion has been filed to accomplish that.

### (5)

Finally Reserve urges that it would be just plain unfair to saddle it with pure water expense because it is already burdened with tremendous potential expense incident to the change-over to land disposal and with already committed air abatement expense. It says that at the encouragement of leading Minnesota citizens and government officials, it established its very expensive operations which have provided jobs and economic opportunity to Northern Minnesota and that, therefore, the government, rather than Reserve should foot the bill for clean water costs.

The history of the beginnings of the taconite industry in Northern Minnesota and its successful operations for many years may well reflect just what is represented by defendants, but this does not minimize the obligation of defendants to shoulder the legal liabilities incident to the operation of a profit making corporation in the free enterprise system. This was exactly the kind of business risk assumed by Reserve when it sought, and was granted, the necessary permits to discharge its tailings in Lake Superior.

Then Minnesota Conservation Commissioner Chester S. Wilson warned Reserve of this risk at a public hearing on June 17, 1947 in an exchange with H. S. Taylor, representing Reserve. The colloquy:

*Chairman Wilson*: "And you understand that if the permit should be granted and the discharge from the water from this plant should result in damaging consequences not contemplated, that the responsibility would be on your company or on the applicant company to take whatever action might be necessary to remedy those conditions."

*Mr. Taylor*: "Why yes, we can stand that risk in any event we have to take certain risks." (T. p. 27)

Later at the hearing, Mr. Taylor said:

This company will be a responsible company and we will recognize our legal liabilities. (T. pp. 30–32)

The Court finds legal liability upon Reserve and hopes it will be a responsible company and recognize it.

The Court is satisfied there is liability on defendants to pay the United States [6] for interim filtration and water supply expense. This expense was incurred at the Courts' specific direction. The sole motivating force for this direction was the finding that a health hazard existed because of Reserve's discharge of amphibole asbestos fibers into Lake Superior from which the affected communities obtain their drinking water.

It was shown at the hearing that the Corps of Engineers has an adequate allocation of funds with which to preliminarily carry out the Court's orders. For that reason there is no necessity for requiring deposits of funds for anticipated costs of water filtration and supplies as requested.

On all of the files, records, findings and conclusions, and decisions of this Court and the Court of Appeals, the Court:

1. Denies United States advance payment of anticipated expenses because the need for such has not been shown.

2. Finds liability against Reserve, Armco and Republic for interim filtration and water supply expense reasonably incurred by United States pursuant to the Court ordered program.

3. Directs the parties to meet promptly to agree, if they can, as to the correctness of the $288,800 sought or as to the exact amount expended. Absent agreement within one week, the Court, upon motion, promptly made, will hear evidence and decide the amount of liability.

4. Will hear additional motions by United States for periodic reimbursement as may be required.

---

**6.** Duluth's motion for reimbursement for temporary water filtration expenses will be decided by a separate order.