UNITED STATES of America, Plaintiff,

The State of Michigan et al.,
Plaintiffs-Intervenors,

State of Minnesota and Minnesota Pollution Control Agency, Plaintiffs,

v.

RESERVE MINING COMPANY et al., Defendants,

Northeastern Minnesota Development Association et al.,
Defendants-Intervenors.

No. 5–72–Civil–19.

United States District Court,
D. Minnesota,
Fifth Division.

May 4, 1976.

John E. Varnum, Washington, D. C., for plaintiff United States.

Michael Ferring, St. Paul, Minn., for United States Army Corps of Engineers.

Byron E. Starns, Philip Olfelt, Paul Faraci and James Schoessler, St. Paul, Minn., for plaintiff State of Minnesota.

William P. Dinan, Robert Asleson, Daniel Berglund, Duluth, Minn., for plaintiff City of Duluth.

Howard Vogel, Minneapolis, Minn., for plaintiffs Minnesota Environmental Law Institute, Inc., Northern Environmental Council, Save Lake Superior Ass'n, Michigan Environmental Student Confederation, Inc., and Environmental Defense Fund, Inc.

Edward Fride, Duluth, Minn., and Maclay Hyde, Minneapolis, Minn., for defendant Reserve Mining Co.

William Egan, Minneapolis, Minn., for defendant Republic Steel Co.

John Gordon and G. Allen Cunningham, Minneapolis, Minn., for defendant Armco Steel Co.

Wayne G. Johnson, Silver Bay, Minn., for defendants Village of Beaver Bay, Silver Bay Chamber of Commerce, Village of Silver Bay, Town of Beaver Bay, Lax Lake Property Owners Ass'n.

## ORDER

1. ASSESSING PENALTIES,
2. IMPOSING SANCTIONS
 and
3. REIMBURSING CLEAN WATER EXPENSE

DEVITT, Chief Judge.

Plaintiff Minnesota seeks an order imposing penalties on defendants for violation of

state pollution control laws and regulations and, with other plaintiffs, moves for an order assessing litigation costs against Reserve Mining Company as a sanction for claimed violations of discovery rules, court orders and other misconduct.

These issues were first presented to the trial court, the Honorable Miles W. Lord presiding, in 1974 but were never adjudicated. Recently these motions were refiled and the parties have submitted legal memoranda detailing their respective positions. Although the principal issue in this lawsuit—that Reserve's discharges into the air and water violate state and federal law, create a potential health hazard and consequently should be enjoined—has already been decided, *Reserve Mining Co. v. Environmental Protection Agency*, 514 F.2d 492 (8th Cir. 1975), these secondary issues remain.

Based on all the files and records, the court concludes that: 1. assessment of penalties is not authorized or appropriate for violations specifically urged by Minnesota; 2. Reserve's violation of the terms of its state permits, which authorize discharges of production wastes into Lake Superior, calls for penalties for each day of violation; 3. Reserve's bad faith in the conduct of the defense of this lawsuit and its failure to truthfully and fully comply with discovery requests and court orders justify sanctions by way of imposition of a portion of plaintiffs' litigation expenses on defendants. We also determine that the city of Duluth is entitled to be reimbursed by defendants for interim clean water expense.

## MINNESOTA'S CLAIMS FOR PENALTIES

It has been established that Reserve has violated Minnesota's pollution control laws and regulations. *Reserve Mining Co. v. En-*

vironmental Protection Agency, 514 F.2d 492, 523–24, 527–29 and 532, n. 78 (8th Cir. 1975); *United States v. Reserve Mining Co.,* 394 F.Supp. 233, 242–45; 380 F.Supp. 11, 56 (D.Minn.1974). Minn.Stat. § 115.071 subd. 3 (1974) authorizes a court to impose a fine of up to $10,000 per day for each violation of, *inter alia*, the laws and regulations violated by Reserve. Minnesota contends that defendants should be fined for daily violations of these laws and regulations for almost a full year.[1]

Reserve's violation of state pollution laws and regulations break down into three categories:

1. violations of regulation WPC 15, water quality and purity standards;
2. violation of air quality regulations and other pollution control requirements;
3. violations of state discharge permits.

The violations in each of these categories will be examined to determine whether penalties under Minn.Stat. § 115.071 subd. 3 (1974) are justified.

Because Reserve, from the outset, has challenged the validity and applicability of WPC 15, imposition of penalties for the many violations of this regulation is not justified.[2] Reserve appealed the final order of the Minnesota Pollution Control Agency (PCA) which implemented WPC 15 to the district court of Lake County in December of 1969. Although that court upheld WPC 15, it decided that WPC 15(a)(4), the antidegradation clause, did not apply to Reserve and that WPC 15(c)(6), the secondary treatment and effluent limitation clause, was arbitrary and unreasonable in its application to Reserve. On appeal by the PCA, the Minnesota Supreme Court affirmed in part and reversed in part and remanded the matter to the district court with instructions to send the case back to the PCA for

---

1. The effective date of the penalty statute was May 20, 1973 and the trial court enjoined further violations by Reserve on April 20, 1974. This is a period of 335 days.

2. Minnesota also claims penalties for violations of WPC 26, the applicable portions of which are identical to the limitations established by

WPC 15. Reserve filed an appeal in state court contesting the validity and applicability of WPC 26 which apparently has not been adjudicated. Therefore, the court's treatment of Minnesota's claim for penalties for violations of WPC 15 is applicable to the claims for violations of WPC 26.

further proceedings. *Reserve Mining Co. v. Minnesota Pollution Control Agency*, 294 Minn. 300, 200 N.W.2d 142 (1972). These proceedings were held in abeyance by the PCA pending resolution of this lawsuit. *United States v. Reserve Mining Co.*, (D.Minn. 5–72–Civ–19, unpublished memorandum and order of April 16, 1973.)[3]

Because Reserve mounted substantial, continuous legal challenges to WPC 15, the law does not authorize imposition of penalties for violations in the first category. *Wadley S. Ry. v. Georgia*, 235 U.S. 651, 35 S.Ct. 214, 59 L.Ed. 405 (1915), *United States v. Pacific Coast European Conference*, 451 F.2d 712 (9th Cir. 1971). *See also Duquesne Light Co. v. Environmental Protection Agency*, 481 F.2d 1 (3d Cir. 1973). *Cf. Train v. Natural Resources Defense Council*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), *Getty Oil Co. v. Ruckelshaus*, 467 F.2d 349 (3rd Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973).

Although previous opinions in this case indicate that Reserve, from time to time, has violated other pollution control laws and regulations, the findings of fact and conclusions of law do not support imposition of penalties for violations in the second category. The findings were made in the context of plaintiffs' request for injunctive relief, the primary remedy sought in this lawsuit, and therefore do not indicate the nature and time of each violation or whether the state was damaged. The claim that each of the violations in the second category occurred daily is not supported by the record. It also should be observed that some of these violations, although not insignificant, are of a lesser magnitude—not the kind of acts which normally justify imposition of penalties.

The third category of violations, the daily dumping of approximately 67,000 tons of carcinogenic waste into Lake Superior polluting public water supplies in violation of its state discharge permits is, by far, Reserve's most serious offense. Despite this,

Minnesota questions its authority, based on the present state of the record, to claim penalties under the statute for Reserve's violations of state discharge permits. Oral argument, April 15, 1976, Tr. at 46 *et seq.* However, Minnesota's complaint as amended does allege violations of Reserve's state discharge permits and asks for civil penalties for all unlawful discharges. The trial court's findings of fact and conclusions of law establish without question that Reserve violated its state permits. *United States v. Reserve Mining Company*, 380 F.Supp. 11, 58 (D.Minn.1974).

In 1947 Reserve obtained from two state agencies, identical permits authorizing it to discharge tailings into Lake Superior. Subsection (d) of those permits prohibits discharges which

> result in any material clouding or discoloration of the water at the surface outside of [the specified discharge] zone . . . nor shall such tailings be discharged so as to result in any material adverse effects on . . . public water supplies . . . .

The district court concluded that "the terms of the permits are being violated" because

> [t]he discharge causes discoloration of the surface water outside of the zone of discharge, causes an increase in turbidity, and adversely affects the public water supplies of several communities resulting in unlawful pollution of the lake. *Id.* at 59.

The court of appeals agreed, stating that:

> The record shows that Reserve is discharging a substance into Lake Superior waters which under an acceptable but unproved medical theory may be considered as carcinogenic. [T]his discharge gives rise to reasonable medical concern over the public health. *Reserve Mining Co. v. Environmental Protection Agency*, 514 F.2d 492, 529 (8th Cir. 1975).

■ Clearly, these findings justify the conclusion that Reserve violated its dis-

---

**3.** Minnesota has conceded that Reserve has consistently challenged the validity and applicability of WPC 15. Oral argument, April 15, 1976, Tr. 51.

charge permits.[4] The trial court has determined that Reserve was in violation of its state discharge permits every day during the May 20, 1973 to April 20, 1974 period. *United States v. Reserve Mining Co.*, 380 F.Supp. 11, 48 (D.Minn.1974).

Minn.Stat. § 115.45 (1974) requires Reserve to comply with the terms of its state permits or be subject to the penalties authorized by Minn.Stat. § 115.071 subd. 3 (1974). Therefore, because Reserve has violated its permits, the only remaining issue is the amount of the penalty.

In making this determination, the court is aware that, as a result of these discharges, defendants are liable for the costs, expected to be approximately six million dollars, of supplying clean water to the affected communities. In addition, the injunction resulting from this litigation will compel Reserve to either cease operations or expend substantial sums, estimated at over three hundred million dollars, to develop an alternative means of disposing of production wastes.

It is not disputed that Reserve, by supplying needed jobs and services, has revitalized the economy of Northeastern Minnesota and, by adding to the supply of domestically produced raw iron, has contributed to the economy of the entire country. But similar contributions have been made by other corporations while complying with applicable pollution control laws and regulations.

It should be appreciated that Reserve did not set out to spoil the air and water or cause inconvenience to or apprehension among residents of the area. It launched its business venture with the encouragement, even the importuning, of all segments of government and society. But in this business venture, the record shows it returned very substantial profits to its corporate owner-parents, Republic and Armco. *United States v. Reserve Mining Co.*, 380 F.Supp. 11, 19, 59–64 (D.Minn.1974). It is reasonable to conclude that some of those profits are attributable to operations made less costly by discharging tailings in Lake Superior rather than on land, as is done by its competitors. *Id.* at 87. And, as is discussed later herein, the record shows that Reserve, particularly through its Vice President Haley, frustrated the court in prompt resolution of the controversy by violation of court rules and orders and thus prolonged the status quo.

While the daily discharge of 67,000 tons of tailings into Lake Superior is shocking in these days of improved environmental awareness, those discharges were expressly authorized in 1947 by the State of Minnesota. Hindsight tells us that was a mistake, but the gravity of it has not yet been determined. The court of appeals held that Reserve's discharges have not yet been found to be harmful to the public health and that the danger is potential, not imminent. The court of appeals found that Reserve need not terminate its operations but directed that preventive and precautionary steps be taken. *Reserve Mining Co. v. Environmental Protection Agency*, 514 F.2d 492, 500 (8th Cir. 1975). They have been taken. So while the record shows violations of the permits, it has not been shown, and in the view of the court of appeals it is not likely it can be shown, that the past violations have caused actual harm to the public health. *Id.* ·

 Upon consideration of all the factors and pursuant to authority of Minn.Stat.

---

4. Reserve fully understood the responsibility it assumed when it applied for permits to discharge into Lake Superior. Then Minnesota Conservation Commissioner Chester S. Wilson warned Reserve of this risk at a public hearing on June 17, 1947 in an exchange with H. S. Taylor, representing Reserve:

*Chairman Wilson*: And you understand that if the permit should be granted and the discharge from the water from this plant should result in damaging consequences not contemplated, that the responsibility would be on your company or on the applicant company to take whatever action might be necessary to remedy those conditions.

*Mr. Taylor*: Why yes, we can stand that risk in any event we have to take certain risks. (T. p. 27)

Later at the hearing, Mr. Taylor said:

This company will be a responsible company and we will recognize our legal liabilities. (T. pp. 30–32)

§ 115.071 subd. 3 (1974), the court imposes on defendants a penalty of $2,500.00 per day for violations of the terms of Reserve's state discharge permits. The penalty must be limited to the period between enactment of the penalty statute, May 20, 1973, and the date the trial concluded and the injunction issued, April 20, 1974—a period of 335 days.[5] The court of appeals vacated the shutdown order on April 22, 1974 and subsequently permitted the continuing discharge until resolution of the issue as to an appropriate on-land disposal site. Thus, the court cannot assess penalties for the period of discharge before the penalty statute was enacted or for the period after the injunction was issued because continued operation and discharge to the present specifically has been permitted by the court of appeals.

In summary, the court concludes that Minnesota's claims for penalties based on violations of pollution control laws and regulations in the first two categories is without merit but the findings as to Reserve's permit violations require the imposition of penalties upon defendants of $2,500.00 per day for 335 days.

## SANCTIONS FOR BAD FAITH CONDUCT AND FAILURE TO MAKE DISCOVERY

One of the primary issues in this lawsuit was whether Reserve would be forced out of business if ordered to modify its discharge methods. It was plaintiffs' position from the beginning that Reserve had the ability to implement an on-land disposal system while Reserve maintained that this was economically and technologically impossible. The trial court determined that Reserve's position was taken in bad faith and made extensive findings concerning Reserve's[6] misconduct during this phase of the lawsuit, *United States v. Reserve Mining Co.,* 380 F.Supp. 11, 18–20, 64–69, 84–85 (D.Minn.1974) summarized at 84–85:

1) Reserve Mining Company represented to this Court that its underwater disposal system was a feasible alternative to the present mode of discharge when in fact the plan had been rejected as technically and economically infeasible.

2) Reserve Mining Company represented to this Court that it was technologically and economically infeasible for them to dispose of their tailings on land, when in fact their own documents indicated that such was not the case.

3) Reserve Mining Company withheld existing documents as to their plans and concepts for on land disposal systems in violation of plaintiffs' discovery requests and this Court's Order.

The trial court found that these actions were taken for the purpose of delaying final resolution of the dispute and resulted in substantial delay, waste of time and unnecessary expense to plaintiffs. *Id.* at 18, 64, 85. Plaintiffs move under Fed.R.Civ.P. 37(b)(d), 45(f) and 54(d) to recover all litigation expenses, estimated to be $721,428.81, as a sanction for Reserve's misconduct.

The record shows the misconduct began when Reserve did not truthfully and fully respond to plaintiffs' interrogatories submitted pursuant to Fed.R.Civ.P 33, requesting that Reserve list all studies by employees or consultants concerning alternative methods of production and discharge. Because Reserve withdrew its objections to these interrogatories and agreed to the discovery order entered on December 12, 1972, it was obligated to answer the questions fully and truthfully. When the answers were filed December 15, 1972, Reserve failed to list numerous studies relating to on-land disposal sites. As additional studies became available, Reserve failed to supplement these answers in a timely fashion as required by the discovery order of December 12 and Fed.R.Civ.P. 26(e).[7] Nor were

---

**5.** Minnesota does not claim penalties for violations which may have occurred after this date.

**6.** The bad faith conduct occurred prior to the formal entry of Armco and Republic into the case.

**7.** For example, the consulting firm of Ripley, Klohn and Leonoff delivered their proposal for disposal in the Palisades Creek area on January 15, 1973. This study was among the several found in the files of Armco and Republic in

the documents produced as they should have been pursuant to subpoena duces tecum commanding Reserve Vice President Haley to bring all such documents to his deposition in January of 1973. Concealment of these essential documents was continued in other depositions as well. In addition, the documents were not produced in response to the trial judge's request that Reserve come forward with its best plan for on-land disposal. *Id.* at 65–69.

In an attempt to explain why the documents were not turned over or identified in response to plaintiffs' first wave of interrogatories, or in compliance with subpoenas, Reserve argues that plaintiffs did not ask for studies relating to on-land disposal. Ignoring the clear language of the interrogatories and the subpoenas, Reserve relies on certain statements made in April of 1973 by Mr. Hills, counsel for the United States. These statements are taken out of context, do not address the interrogatories at issue, and were made several weeks after Haley's deposition and Reserve's inadequate answers.

In addition, Reserve now maintains that the documents in question need not have been produced since they were protected by one or more of the following legal theories:

1. attorney-client privilege,
2. work product,
3. trade secret,
4. offer of compromise.

■ These claims appear to be no more than a belated rationalization for the unjustified refusal to identify and turn the documents over to plaintiffs. Even assuming that the studies qualified for protection under one or more of the above theories, Reserve's failure to identify the documents and assert the appropriate objection before the trial judge, precludes it from relying on these theories now. Fed.R.Civ.P. 37(d). Reserve did not have the unilateral right to determine which documents were protected and consequently not reveal the existence of those documents. The pretrial order of December 12, 1972 provides that documents prepared "by a lawyer actively engaged in legal duties in anticipation of litigation or for trial need not be identified," but this provision was not applicable to the hundreds of documents prepared by defendants' engineers and consultants and not identified.

If Reserve had validly asserted the various objections in a timely fashion, it is unlikely that any of them would have been meritorious. Reserve does not adequately explain how the privilege that attaches to confidential communications between an attorney and client would protect engineering studies, many of which were prepared by independent consultants and transmitted to Reserve, Armco, and Republic, not to Reserve's attorneys. Similarly, it is highly unlikely that the work product rule would have ultimately shielded these documents from plaintiffs. Even if the documents could qualify for some protection under Fed.R.Civ.P. 26(b)(3), to the extent that they do not represent mental impressions, conclusions, opinions, or legal theories of the attorneys or other representatives, they would have been discoverable upon a showing of necessity.

Portions of the studies might have been protected by a trade secret "privilege", as were other matters in the case relating to Reserve's secret processes used in the production of taconite pellets. However, under no circumstances could this trade secret exemption for processes extend to all of these documents, many of which related to physical facts such as size and location of dams and tailings basins. Those few documents relating to secret processes, if involving a genuine trade secret, could have been protected if Reserve had moved for a protective order.

■ Finally, the claim that the documents were part of an offer of compromise is frivolous. Many of the documents were

March of 1974. Subsequent to plaintiffs' discovery of these documents in the files of Armco and Republic, Reserve filed a meaningless

supplemental response listing these same documents.

never included in a compromise offer. Accepting this argument would mean that reserve could shield all documents relating to the economic and technological feasibility of alternative discharge systems because at some latter date they might be used in compromise negotiations. This, obviously, is not the law. The purpose for the privilege surrounding offers of compromise is to encourage free and frank discussion with a view toward settling the dispute. It is not designed to shield otherwise discoverable documents, merely because these documents represent factual matters that might be or are incorporated in a settlement proposal. *See e. g., NLRB v. Gotham Industries, Inc.,* 406 F.2d 1306 (1st Cir. 1969); *United States v. Tuschman,* 405 F.2d 688 (6th Cir. 1969); Fed.R.Ev. 408.

The court is satisfied that each of the defenses asserted is without merit and the failure to identify and produce the documents was not substantially justified.

Reserve contended both before and during trial that the only feasible alternative method of disposal was by means of a conduit transporting wastes to the floor of the lake. This contention thwarted all settlement efforts and made final resolution of the issues presented more difficult. *United States v. Reserve Mining Co.,* 380 F.Supp. 11, 65, 85 (D.Minn.1974). The findings of fact reflect that this contention was not asserted in good faith. *Id.* at 18, 19, 64–67. In March of 1974 when officers of Armco and Republic were deposed, plaintiffs and the trial judge discovered for the first time that Reserve had withheld hundreds of documents dealing with alternative methods of disposal. *Id.* In addition, the documents revealed that the deep piping system had been rejected by defendant's engineering task force long before as being technologically impossible and economically infeasible. When asked about the undisclosed rejection of the deep piping concept, Reserve attempts to characterize this "rejection" as an interim engineering report from an engineer at Armco, of which the Reserve employees in Minnesota had no knowledge. The document speaks for itself. U.S.Ex. 430. It is entitled "Reserve Mining Company—Tailings Disposal—Alternate Studies—Final Recommendation." It includes a statement from the Engineering Task Force which recommends, for economic and technological reasons, that the underwater reef disposal system not be pursued any further. The findings of fact indicate that Reserve Vice President Haley was the chairman of the Engineering Task Force. *Id.* at 65.

There is ample authority in the statutes, rules and decisions to impose sanctions.[8] The Supreme Court recently reviewed the question of when attorneys' fees may be assessed in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141, 154 (1975):

> [A] court may assess attorneys' fees for the "willful disobedience of a court order . . . as part of the fine to be levied on the defendant. *Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 426–428 [43 S.Ct. 458, 465–466, 67 L.Ed. 719] (1923)." *Fleischmann v. Distilling Corp. Maier Brewing Co., . . .* 386 U.S. [714, 87 S.Ct. 1404, at 1407, 18 L.Ed.2d 475] at 718, or when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . ." *F. D. Rich Co.* [*F. D. Rich Co. v. U. S. for Use of Indus. Lumber Co.,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703], 417 U.S. at 129, (citing *Vaughan v. Atkinson,* 369 U.S. 527, [82 S.Ct. 997, 8 L.Ed.2d 88] (1962)) . . . .

In the instant case the trial judge found that Reserve failed to divulge materials to plaintiffs during discovery and to the court in direct violation of the court's orders. As has already been noted, the trial judge concluded that the concealment of the materials was part of a course of conduct adopted by Reserve in bad faith "for the sole pur-

8. Reserve does not dispute the court's authority to impose sanctions. Transcript of oral argument, April 15, 1976, p. 112.

pose of delaying the final resolution of the controversy," *United States v. Reserve Mining Co.,* 380 F.Supp. 11, 64 (D.Minn.1974). Such conduct justifies the award of attorneys' fees and other expenses as a sanction. *Id.* and Fed.R.Civ.P. 37(b) and (d), 45(f), 54(d).

However, the record does not support sanctions measured by an award of *all* litigation expenses as urged by plaintiffs. Minnesota agrees there was no misconduct by defendants during that part of the lawsuit devoted to the public health claims. *Reserve Mining Co. v. United States,* 498 F.2d 1073, 1085, n. 13 (8th Cir. 1974).

However, unwinding this nine-month trial with its exhaustive pretrial discovery proceedings and companion state and federal administrative proceedings to determine with exactness what expenses are attributable to one or another phase of the lawsuit or what percentage of the expense was caused by defendant's misconduct is a practical impossibility. At oral argument, counsel could not suggest a feasible method of doing so. Plaintiffs maintain that if they had known prior to trial that defendants' engineers could develop a feasible alternative disposal site, much, if not all, of the trial could have been avoided. Defendants dispute this.

■ Faced with this record, we must make an apportionment as best we can. It is the court's best estimate, based on all the files and records including the suggested itemized fees and expenses submitted by plaintiffs and the court's familiarity with attorneys' fees, that the sum of $200,000.00 will fairly reimburse plaintiffs for their expenses and reasonably compensate them for attorneys' fees, and with that as a measure, the court assesses sanctions against Reserve of $200,000.00 to be apportioned by plaintiffs among themselves.

**9.** The court rejects defendants' claim that Duluth's complaint was not sufficient to permit recovery based on violations of Minnesota statutes and regulations and permits. The factual allegations in the complaint are sufficiently broad to permit recovery. Furthermore, the complaints of other parties to the law suit spe-

## DULUTH'S MOTION FOR REIMBURSEMENT FOR INTERIM WATER EXPENSES

■ The city of Duluth seeks reimbursement in the amount of $22,920.00 for expenses incurred in providing its residents with clean drinking water, free from the asbestos contamination caused by defendant's discharge. Along with a similar motion by the United States, this motion was argued on February 18, 1976, resulting in a determination that the defendants are liable for all expenses incurred by the United States in providing filtered water to North Shore communities. *United States v. Reserve Mining Co.,* 408 F.Supp. 1212 (D.Minn.1976). The court requested additional briefs from the parties with respect to Duluth's legal basis for seeking similar relief. Briefs have been lodged.

It has been determined that defendants' discharge into the water violates various Minnesota statutes, regulations and permits. These violations have resulted in a potential health threat necessitating a temporary water filtration program, causing expense to the city of Duluth. As an injured party, Duluth has standing to seek relief for these violations under Minn.Stat. 116B.03 (1974).[9] Based on these findings and the rationale set forth in the Order of February 21, 1976, *id.,* the court concludes that defendants are liable for expenses reasonably incurred by the city of Duluth in providing its residents with clean water on a temporary basis. Absent agreement by the parties as to the exact amount, the court will determine it on motion.

### SUMMARY

We determine that:

1. Defendants violated the terms of the state granted water discharge permits daily between May 20, 1973 and April 20, 1974—a

cifically allege the violations in question, these issues were fully litigated, and decided adversely to defendants. Defendants can show no prejudice in permitting Duluth to assert these identical legal theories.

period of 335 days—and are assessed penalties of $2,500.00 per day for a total of $837,500.00.

2. Reserve violated court rules and orders as to discovery and is assessed sanctions of $200,000.00.

3. The city of Duluth is entitled to be reimbursed in the approximate sum of $22,920.00 for furnishing interim clean water facilities and supplies to its residents.

The court has now determined all pending issues properly within its province. Remaining for resolution is agreement between the State of Minnesota and Reserve Mining Company as to an appropriate on-land taconite waste disposal site. Prompt accord on this issue hopefully will signal the end of this long pending, and often acrimonious, controversy so that Minnesota and its people can return to a normal and productive society with the environment preserved and public health protected.